ON REHEARING
WEAVER, J.
This Court originally granted leave to appeal to consider whether MCL 500.3104(2) obligates the Michigan Catastrophic Claims Association (MCCA) to reimburse a member insurer for personal protection insurance (PIP) benefits paid to a claimant without regard to the reasonableness of the member insurer’s payments of PIP benefits. This Court issued an opinion reversing the Court of Appeals and remanding for further proceedings, while holding that “when a member insurer’s policy only provides coverage for ‘reasonable charges,’ the MCCA has authority to refuse to indemnify unreasonable charges.”[1] Subsequently, plaintiffs United States Fidelity & Guaranty Company and Hartford Insurance Company of the Midwest filed mo *6 tions for rehearing. We granted plaintiffs’ motions for rehearing, and these cases were resubmitted for decision without further briefing or oral argument.[2]
We now hold that the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the “practices and procedures” of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Moreover, we hold that the power granted to the MCCA under MCL 500.3104(8)(g) is limited to furthering the purposes of the MCCA and that determining reasonableness is not one of its purposes. Finally, although the MCCA has no right to directly challenge the reasonableness of a claim, the no-fault statute does provide the MCCA with safeguards against negligent actions of member insurers. Accordingly, we affirm the judgment of the Court of Appeals.
I. FACTS AND PROCEDURAL HISTORY

UNITED STATES FIDELITY & GUARANTY CO v MCCA

In the first case in these consolidated appeals, Daniel Migdal was injured in a 1981 car accident in which he sustained catastrophic injuries. His injuries included a traumatic brain injury with cerebral spastic quadriplegia, severe oral motor apraxia, and dysphasia. Because of the extent of the injuries, Daniel was prescribed, and received, 24-hour-a-day nursing care. In 1988, Michael Migdal (Mr. Migdal), Daniel’s father and the conservator of Daniel’s estate, sued the no-fault insurance *7 provider, United States Fidelity & Guaranty Company (USF&G), to recover expenses paid for Daniel’s care. In 1990, the parties entered into a consent judgment. Pursuant to the judgment, USF&G paid Mr. Migdal $35,000 in exchange for a release from all contractual liability for nursing care provided before May 10, 1989. Additionally, USF&G agreed to pay $17.50 an hour for Daniel’s home nursing care for the following year.[3] The payments would be made regardless of whether Daniel’s parents provided the nursing care or a third party was brought in to provide the care. The hourly rate, fixed for the first year after the judgment, was subject to an annual increase of 8.5 percent. The increased rate would be compounded based on the previous year’s rate.
Pursuant to the consent judgment, USF&G paid Mr. Migdal the consented-to hourly wage.[4] *6Once the amount paid to Mr. Migdal had reached the statutory threshold amount of $250,000,[5] the MCCA began to reimburse *8 USF&G for payments made to Mr. Migdal that exceeded the threshold. However, after the hourly rate had increased significantly with the passage of time, the MCCA eventually refused to reimburse USF&G for amounts that USF&G paid Mr. Migdal under the consent judgment, on the ground that the amounts were unreasonable. In 2003, USF&G filed a complaint in the Oakland Circuit Court for a declaratory judgment that the MCCA must reimburse USF&G for the total amount that USF&G paid to Mr. Migdal under the consent judgment, regardless of the reasonableness of the amount. At the time, USF&G was paying $54.84 an hour to Mr. Migdal for Daniel’s nursing care.[6] The MCCA sought to only be required to reimburse USF&G at a rate of $22.05 an hour, arguing that the agreed-upon rate of $54.84 an hour was unreasonable and, therefore, the MCCA should not have to reimburse USF&G for the total amount. Meanwhile, USF&G sought to have the consent judgment with Mr. Migdal revised, arguing that circumstances had changed when Mr. Migdal hired a third party to c.are for Daniel instead of providing the nursing care himself. Mr. Migdal filed a motion for summary disposition for failure to state a claim upon which relief could be granted. The court granted Mr. Migdal’s motion.[7]
Likewise, the MCCA moved for summary disposition. It contended that there was no question of material fact that the payments made by USF&G to Mr. Migdal were unreasonable. Moreover, the MCCA argued that the no-fault act only required reimbursement of payments *9 that are reasonable. In a countermotion for summary disposition, USF&G argued that the no-fault act required the MCCA to reimburse it for the full amount paid to Mr. Migdal, despite any unreasonableness regarding the amount paid. Alternatively, USF&G argued that there was a question of material fact concerning the “unreasonableness” of the consent judgment.
The trial court granted USF&G’s motion for summary disposition, ruling that the MCCA must reimburse USF&G for its “ultimate loss,”[8] including the entire amount that USF&G had to pay Mr. Migdal, regardless of whether the amount paid was reasonable. The trial court denied the MCCA’s motion for summary disposition. The trial court entered a judgment requiring the MCCA to reimburse USF&G in the amount of $1,725,072 under the no-fault act and holding the MCCA liable for future payments consistent with the consent judgment. The parties agreed to stay the enforcement of the order while the MCCA appealed by right in the Court of Appeals.

HARTFORD INS CO v MCCA

In the second case of these consolidated appeals, Robert Allen was injured in a 2001 car accident in which he sustained catastrophic injuries. His injuries included right-sided pleuritic effusion, brain injuries, quadriparesis, bilateral frozen shoulder, and cardiopathy. Because of the extent of the injuries, Allen was prescribed, and received, 24-hour-a-day care by a licensed nurse. Hartford Insurance Company of the Midwest (Hartford), Allen’s no-fault insurer, initially paid $20 an hour for the nurse. In 2003, Hartford agreed to pay an increased rate of $30 an hour for Allen’s care. *10 Soon thereafter, Hartford’s payments for Allen’s care exceeded the $250,000 statutory threshold.
The MCCA refused to reimburse Hartford for any payments above $20 an hour for the services rendered. Hartford filed a complaint for a declaratory judgment that would require the MCCA to pay Hartford $571,847.21 as reimbursement for payments exceeding the no-fault threshold. Additionally, Hartford sought a declaration that the MCCA must reimburse Hartford for the total payments above the $250,000 threshold, regardless of the reasonableness of the payments. After the initial filing, Hartford moved for summary disposition, arguing that the no-fault act required the MCCA to reimburse Hartford for the entire amount paid to Allen that exceeded the threshold, regardless of the reasonableness of that amount. The MCCA argued that it only had to reimburse Hartford for reasonable payments and that there was insufficient discovery concerning the reasonableness of the amount of the payments. The circuit court ruled that reasonableness was an element in determining how much the MCCA must reimburse Hartford and that there was insufficient discovery to determine if the payments were reasonable. Hartford immediately appealed the trial court’s holding requiring the element of reasonableness to be considered.
THE COURT OF APPEALS’ DECISION
The Court of Appeals consolidated the USF&G and Hartford cases and held that “MCL 500.3104 does not incorporate a ‘reasonableness’ requirement and requires the MCCA to reimburse insurers for the actual amount of PIP benefits paid in excess of the statutory *11 threshold.”[9] (Emphasis in the original.) The MCCA sought leave to appeal in this Court, and this Court granted leave.[10] This Court issued an opinion reversing the Court of Appeals and remanding for further proceedings, while holding that “when a member insurer’s policy only provides coverage for ‘reasonable charges,’ the MCCA has authority to refuse to indemnify unreasonable charges.”* [11] Subsequently, plaintiffs United States Fidelity & Guaranty Company and Hartford Insurance Company of the Midwest filed motions for rehearing. We granted plaintiffs’ motions for rehearing and this case was resubmitted for decision without further briefing or oral argument. 483 Mich 918 (2009).[12]
*12 II. STANDARD OF REVIEW
Statutory interpretation is a question of law, which this Court reviews de novo. In re Investigation of March 1999 Riots in East Lansing (People v Pastor), 463 Mich 378, 383; 617 NW2d 310 (2000). This Court reviews de novo a trial court’s decision regarding a motion for summary disposition. Herald Co v Bay City, 463 Mich 111, 117; 614 NW2d 873 (2000).
III. ANALYSIS
The issue before this Court involves how much of a member insurer’s coverages the MCCA must indemnify in the event of a catastrophic injury. Specifically, is the MCCA liable for reimbursement of PIP payments based on potentially unreasonable claims?
The outcome of these cases depends on this Court’s interpretation of the language in MCL 500.3104. An overarching rule of statutory construction is “that this Court must enforce clear and unambiguous statutory provisions as written.” In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass’n), 433 Mich 710, 721; 449 NW2d 660 (1989) *13 (quotation marks omitted). “If the language of [a] statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written.” Sun Valley Foods Co v Ward, 460 Mich 230, 236; 596 NW2d 119 (1999). However, “what is ‘plain and unambiguous’ often depends on one’s frame of reference.” Shiffer v Gibraltar School Dist Bd of Ed, 393 Mich 190, 194; 224 NW2d 255 (1974). In order to ascertain this frame of reference, the contested provisions must be read in relation to the statute as a whole and work in mutual agreement. In re Certified Question, 433 Mich at 722. See also State Treasurer v Wilson, 423 Mich 138, 144; 377 NW2d 703 (1985).
Additionally, the frame of reference shares a deep nexus with the intent of the Legislature. “The primary goal of statutory interpretation is to give effect to the intent of the Legislature.” Title Office, Inc v Van Buren Co Treasurer, 469 Mich 516, 519; 676 NW2d 207 (2004), quoting In re MCI Telecom Complaint, 460 Mich 396, 411; 596 NW2d 164 (1999). Fundamentally, “[t]his task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of [the Legislature’s] intent.. . .” Sun Valley, 460 Mich at 236 (citation and quotation marks omitted). This Court must “consider both the plain meaning of the critical word or phrase as well as ‘its placement and purpose in the statutory scheme.’ ” Id. at 237, quoting Bailey v United States, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). “As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.” Sun Valley, 460 Mich at 237.
*14 In interpreting § 3104, this Court first must determine how § 3104(2) corresponds with § 3107 and how these two provisions correspond within the entire statutory scheme. Section 3104(2) requires that the MCCA “shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence .... ”[13] Section 3107(l)(a) defines “personal protection insurance benefits” as “[allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person’s care, recovery or rehabilitation.” This provision requires that all PIP benefits claimed and paid between the insurer and the insured must be reasonable. The MCCA argues that this Court should incorporate the § 3107 definition of “benefits” into § 3104(2) where § 3104(2) refers to “coverages.” However, we decline to do so because the phrase “personal protection insurance benefits” has a distinct meaning from the phrase “personal protection insurance coverages” that is found in § 3104(2).
When the Legislature uses different words, the words are generally intended to connote different meanings. Simply put, “the use of different terms within similar statutes generally implies that different meanings were intended.” 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 46:6, p 252. If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word. Therefore, we disagree with the MCCA and hold that the definition of personal protection insurance benefits *15 found in § 3107(l)(a) (including the reasonableness standard) is not equivalent to the definition of personal protection insurance coverages in § 3104(2).
The distinctive use of the term “coverages” is important. LeBlanc v State Farm Mut Auto Ins Co, 410 Mich 173, 204; 301 NW2d 775 (1981) (“ ‘Coverage’, a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance.”). Although the terms “benefits” and “coverages” are related because of their close proximity in the statute,[14] the proximity of these two terms does not mean that they are synonymous.
Section 3107 excludes from the definition of “allowable expenses” within PIP “coverage” hospital charges in excess of reasonable and customary semi-private room charges and funeral and burial expenses in amounts specified in the policy (subject to a range specified in that section). This leaves all other charges open to PIP “coverage.” The fact that the Legislature limited the exceptions to “coverage” so narrowly indicates that the term “coverage” is a broader term than “benefits.” Moreover, because “coverages” is never given a more restrictive definition elsewhere in the *16 statutes, the word must be afforded its ordinary, everyday meaning. Sun Valley, 460 Mich at 237 (“The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.”). In the grammatical context, the meaning of “coverages” is its common meaning, limited only by the specific statutory exceptions.
“Coverage” is defined in dictionaries as the “[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities,”[15] as “protection against a risk or risks specified in an insurance policy,”[16] as “the risks within the scope of an insurance policy,”[17] and as the “amount, and extent of risk covered by insurer.”[18] Under the common meaning of “coverage,” the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer’s coverage. USF&G and Hartford paid funds pursuant to a consent judgment and a settlement agreement with the respective insureds. This contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties. The reasonableness of the agreed payment amount is not a factor.
The meaning of “coverages” in MCL 500.3104 becomes clearer after considering “ ‘its placement and purpose in the statutory scheme.’ ” Sun Valley, 460 Mich at 236, quoting Bailey, 516 US at 145. In the statute, “coverages” is positioned just after “ultimate loss.” “Ultimate loss” is statutorily defined as the “actual loss amounts that a member is obligated to pay and that are paid or payable by the member . .. .” MCL *17 500.3104(25)(c) (emphasis added). The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount. Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount to which the insurer and the insured agreed, and subject to PIP coverage. The ultimate loss specifically refers to coverage, which is broader than benefits and is not statutorily limited to reasonable payments.[19]
Moreover, the MCCA is not a no-fault insurer of its member companies, and the member companies are not injured persons entitled to no-fault indemnification. Thus, the relationship between the MCCA and its members is not subject to the reasonableness requirements found in MCL 500.3107. Rather, the Legislature provided in § 3104(2) that the MCCA would “indemnify” the insuring members for PIP payments. The Legislature did not state that the MCCA would “insure” or “reinsure” the members for amounts greater than the threshold. Black’s Law Dictionary (5th ed) defines “indemnify” as “[t]o restore the victim of a loss, in whole or in part, by payment... ; to secure against loss or damage. .. .” Indemnification is not a contingent plan like an insurance plan. Instead, it is a set security *18 meant to assist against certain circumstances. Here, those circumstances arise when the PIP amount contracted by the insurer exceeds the statutory threshold.
Section 3401(1) states that the MCCA is “not subject to any laws .. . with respect to insurers.” Thus, the MCCA is not a no-fault insurer, and consequently it is also not a reinsurer. Because the MCCA is not a no-fault insurer, but, rather, an indemnitor of no-fault insurers for benefits in excess of the statutory threshold, § 3107 does not directly bind the MCCA; it only binds the insurer members and the insured. Section 3107 “makes both reasonableness and necessity explicit and necessary elements of a claimant’s [insured’s] recovery . . ..” Nasser v Auto Club Ins Ass’n, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis added). Specifically, it is the insurance company that has the right to deny a claim (or part of a claim) for unreasonableness under § 3107. The insured then has the burden to prove that the charges are in fact reasonable. See, generally, Nasser, 435 Mich at 49, Manley v Detroit Automobile Inter-Ins Exch, 425 Mich 140; 388 NW2d 216 (1986), and LaMothe v Auto Club Ins Ass’n, 214 Mich App 577; 543 NW2d 42 (1995). Given that the established burden of proof is on the insured, it is counterintuitive to conclude that the member insurance company would benefit from not having the burden of proof in one instance against an insured, but having the burden in another instance against the MCCA.
The MCCA maintains that the foregoing statutory constructions will lead to higher costs to insureds and will be a disincentive for member insurers to keep payments reasonable. These fears are unfounded. The MCCA is an unincorporated nonprofit association, whose purpose is to provide insurers with indemnification for PIP policies that exceed a certain threshold. See *19 MCL 500.3104(1). The Legislature created the MCCA “in response to concerns that Michigan’s no-fault law provision for unlimited [PIP] benefits placed too great a burden on insurers, particularly small insurers, in the event of ‘catastrophic’ injury claims.” In re Certified Question, 433 Mich at 714. The MCCA maintains that it should have the ability to unilaterally stop making indemnification payments to a member when it determines that the claim payments are unreasonable. Yet, the MCCA acknowledges that a member can take the MCCA to court over a reasonableness dispute, which would leave a finder of fact as the ultimate authority over whether the payments are reasonable.
In essence, under the MCCA’s preferred outcome, when a member insurer makes an agreement with an insured (often in a litigation setting, whether it be an arbitration hearing, consent judgment, or declaratory judgment), the member must then sue the MCCA if the MCCA finds that the payment is unreasonable. If this Court were to accept the MCCA’s argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then force a jury trial with every catastrophically injured claimant in order to secure a verdict with a “reasonable” stamp on the result. This outcome goes against the legislative purpose of ensuring efficient and quick recovery for claimants in the no-fault system. Shavers v Attorney General, 402 Mich 554, 578-579; 267 NW2d 72 (1978) (“The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.”).
In response to the MCCA’s concerns, it should be pointed out that the MCCA is not without a safeguard to protect against unreasonable payments. The Legis *20 lature specifically laid out powers that the MCCA can exercise to guard against unreasonable settlements of catastrophic claims. MCL 500.3104(7)(b) states that the MCCA shall
[establish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.][20]
This statutory language requires and empowers the MCCA to establish procedures to protect itself from unreasonable settlements in all cases involving claims that may exceed the threshold and consequently affect the MCCA. The MCCA’s plan of operation likewise echoes these statutory requirements.[21] This language enables the MCCA to establish procedures that will enable it to exercise appropriate control over settlements whenever the member reasonably anticipates that the claim will involve the MCCA.
Only then, not after the claimant and member insurer have reached a settlement, can the MCCA exer *21 cise control over the settlement process. Under MCL 500.3104(7)(g), the MCCA must
[establish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member. [Emphasis added.]
Thus, when § 3104(7)(g) is read in conjunction with § 3104(7)(b), the outcome is that the MCCA is required to review those reports by members that anticipate needing indemnification and to assess the adequacy of the procedures or practices of the member.[22] Upon a finding of inadequacy, the MCCA can adjust the practices or procedures of the member.[23] One of the key protections here is that the MCCA has the power and *22 duty to adjust only “procedures and practices” of the member that produce an unreasonable payment amount; the power does not include the power to adjust the amount after a settlement has been reached.[24] The MCCA has the power to step in before a settlement has been reached and adjust situations that it anticipates might otherwise expose it to unreasonable indemnification costs. By requiring submission of proposed settlement agreements for approval, the MCCA can protect itself against later having to pay unreasonable claims from member insurers. The exercise of these powers is the MCCA’s protection against a member’s neglect of its duties.
Finally, the MCCA argues that § 3104(8) (g) gives it the power to question reasonableness regardless of the statute’s other provisions. Specifically, § 3104(8)(g) allows the MCCA to “[p]erform other acts not specifically enumerated in this section that are necessary or proper to accomplish the purposes of the association and that *23 are not inconsistent with this section or the plan of operation.” However, this section does not give the MCCA carte blanche to simply avoid a member insurer’s agreement that it finds unreasonable. The power granted under § 3104(8)(g) is limited to accomplishing the “purposes of the association.” More importantly, the exercise of this power cannot be “inconsistent with this section or the plan of operation.” Id. The plan of operation created pursuant to § 3104(17) must be “consistent with the objectives and provisions of this section, which shall provide for the economical, fair, and nondiscriminatory administration of the association and for the prompt and efficient provision of indemnity.” MCL 500.3104(17) (emphasis added).
Section 3104(8)(g) allows the MCCA to fulfill the specific requirements of the statute. Accordingly, we interpret § 3104(8) (g) as granting the MCCA the limited power to further its purpose of prompt and efficient indemnification of its members. To interpret that section as granting any further power, such as the power to decline indemnification on the basis of the reasonableness of the indemnification amount, would be inconsistent with the Legislature’s intent.
IV RESPONSE TO THE DISSENT
The dissent raises the concern that a decision in favor of plaintiffs in this case will result in substantially increased insurance costs. Certainly, insurance costs are a critical concern, but they are a policy concern that belongs to the Legislature. Nonetheless, we observe that the concern appears highly speculative and, indeed, unfounded. There is no evidence that insurers have engaged or will engage in slack negotiations. It bears mentioning here that there is no indication that the settlements in these cases were unreasonable when made.
*24 The dissent bases its concern on an affidavit from defendant’s executive director in which she refers to an estimate provided by consultants to defendant. No basis is given in the affidavit for the estimated increase in costs. And there is reason to wonder about this estimate, at least inasmuch as it might be based on an anticipated decision from this Court.
First, there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers’ settlements with their insureds until very recently. It is difficult to understand how it will cost defendant extravagant sums to give up a practice it has only recently begun. Second, it is unknown whether the actuarial assessment factored in the effect of defendant’s potential use of the cost-containment procedure actually provided by the Legislature in MCL 500.3104(7) (g).
As mentioned, the Legislature has provided that “[i]f the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake ... to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association . . . .” MCL 500.3104(7)(g). There is no evidence that the actuarial assessment considered the effect of defendant’s implementation of this legislatively provided cost-savings mechanism.
The dissent additionally fails to recognize that there is a compelling policy reason to reject defendant’s claim that it may review settlements for reasonableness: namely, to limit litigation and promote settlements. This Court has long recognized that “[t]he goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain eco *25 nomic losses.” Nelson v Transamerica Ins Services, 441 Mich 508, 514; 495 NW2d 370 (1992) (citation and quotation marks omitted). Additionally, this Court has stated that “[t]he act is designed to minimize administrative delays and factual disputes that would interfere with achievement of the goal of expeditious compensation of damages suffered in motor vehicle accidents.” Miller v State Farm Mut Auto Ins Co, 410 Mich 538, 568; 302 NW2d 537 (1981). The ability of insurers to settle claims is essential to meeting these goals. Yet, if defendant can reexamine settlements of reasonableness long after they are made, then insurers will be very reluctant to make settlements. Further, a new layer of litigation for after-the-fact reasonableness assessments, such as this one, would be inevitable. There is no evidence that the actuarial assessment on which the dissent relies has accounted for the substantial increase in litigation costs that would result if this Court allows defendant the extrastatutory power to question settlements for reasonableness after they are made.
But, again, these are policy concerns best addressed by the Legislature. It appears that the Legislature has indeed balanced these concerns in the provisions of MCL 500.3104, and there is no reason for this Court to apply a strained construction to the statutes to achieve a goal contrary to the purposes of the no-fault act. In the unlikely event that insurers become milquetoast negotiators, defendant has the statutorily provided protection to remedy the situation.
v CONCLUSION
We hold that the indemnification obligation set forth in § 3104(2) does not incorporate the reasonableness standard that § 3107 requires between claimants and member insurers. Furthermore, the powers granted to *26 the MCCA in § 3104(7) are limited to adjusting the “practices and procedures” of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Finally, we hold that the power granted to the MCCA under § 3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes.
Accordingly, we affirm the Court of Appeals holding that the MCCA must reimburse its member insurers 100 percent of the ultimate loss exceeding the statutory threshold for claims without a reduction based on its unilateral assessment of the reasonableness of the amount.
Affirmed.
Kelly, C.J., and Cavanagh and Hathaway, JJ., concurred with Weaver, J.

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 482 Mich 414, 417; 759 NW2d 154 (2008).

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 483 Mich 918 (2009).

 Mr. Migdal created a company to manage Daniel’s care. This company acted as an intermediary that used the benefit payments from USF&G to pay the hired nurses who cared for Daniel and to pay Mr. Migdal for his efforts in Daniel’s care. The judgment contained a provision stating that if Daniel’s condition substantially changed, the court retained jurisdiction and could determine whether a reduction or increase in the payments was “warranted.”

 Mr. Migdal testified that his duties included reading papers concerning business management and medical advances, checking and providing maintenance of Daniel’s equipment, keeping the hooks, paying the nurses, and shopping for necessary items for Daniel’s care.

 MCL 500.3104(2) reads, in pertinent part:
[T]he association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence ....
At the time of both accidents involved in these consolidated appeals, the threshold amount was $250,000.

 Mr. Migdal paid $32 an hour of this amount to the nurses (including benefits) and kept the rest as compensation for his work.

 USP&G did not appeal that decision. We therefore express no opinion on whether the consent judgment would have been subject to judicial modification on the ground that the payment amount it called for had become unreasonable with the passage of time.

 MCL 500.3104(2).

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 274 Mich App 184, 192; 731 NW2d 481 (2007).

 481 Mich 862 (2008).

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 482 Mich 414, 417; 759 NW2d 154 (2008).

 Justices Corrigan and Young were simply shown as denying the motions for rehearing. However, Justice Young, in his dissent joined by Justice Corrigan, now takes the opportunity well after the motions for rehearing have been decided to attack the remaining justices who did not vote to retain this Court’s earlier decision.
The dissent erroneously asserts that the justices voting to grant rehearing erred because Peoples v Evening News Ass’n, 51 Mich 11, 21; 16 NW 185 (1883), held that this Court is precluded from granting rehearing when the composition of the Court has changed, absent any new arguments from the parties in the cases. However, contrary to the dissent’s assertions, this Court merely stated in Peoples that a change in the composition of this Court cannot be the basis for granting rehearing.
Accordingly, if the composition of the Court changes, and the composition becomes such that a majority of the Court sees a reason to grant rehearing, the majority is not precluded under Peoples from granting rehearing. If, for instance, four justices on the newly composed Court concluded that the challenged opinion was erroneous, those justices can vote to grant rehearing. The same holds true whether the deciding vote is a new justice who joined the Court after the challenged opinion was *12 released or whether the deciding vote comes from a justice who signed the challenged opinion and changed his or her mind after further consideration.
This practice is consistent with MCR 2.119(F)(3), which creates a “palpable error” standard for rehearing cases. It is up to the moving party to show palpable error that would lead to a different disposition in the case. If a majority of the Court is convinced by the moving party, the Court has the discretion to grant rehearing. Furthermore, while MCR 2.119(F)(3) states that a motion for rehearing will generally not be granted if the motion only presents the same arguments decided in the original disposition of the case, MCR 2.119(F)(3) explicitly refrains from “restricting the discretion of the court” to grant rehearing.
Accordingly, we are not persuaded by the dissent’s attempts to discredit this Court’s order that granted rehearing in this case.

 The amounts are statutorily set to increase over time. At the time of both accidents, the threshold amount was $250,000. In 2008, the threshold amount was $440,000. See MCL 500.3104(2)(a) to (k).

 MCL 500.3107(1) provides, in pertinent part:
Except as provided in subsection (2), personal protection insurance benefits are payable for the following:
(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person’s care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations ... or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00. [Emphasis added.]

 Webster’s II New College Dictionary (1995).

 Random House Webster’s College Dictionary (2001).

 Black’s Law Dictionary (7th ed).

 Black’s Law Dictionary (5th ed).

 The MCCA argues that if there is not a reasonableness factor for it to enforce, the member insurers will have no incentive to make reasonable settlements that do not exceed the statutory threshold amount because the insurers will not be hable to pay anything beyond the threshold amount. However, one incentive comes from higher premiums paid to the MCCA. See MCL 500.3104(7)(d) (requiring that the MCCA assess its member companies an annual premium on each of their no-fault policies written in Michigan). If all the individual members act in a manner that does not regard the reasonableness of their settlements, then insurance premiums will increase greatly.

 Section 3104 includes numerous other rules for the MCCA, such as membership requirements, liability, and creation of a “plan of operation.”

 Art X, § 10.01 of the plan of operation provides in part:
Members shall report to the Association such information as the Board may require on forms prescribed by the Board: (a) As soon as practicable after the loss occurrence, Members shall report each claim which, on the basis of the injuries or damages sustained, may reasonably be anticipated to result in a Reimbursable Ultimate Loss, and for purposes of reporting the Member shall consider itself legally liable for the injuries and damages.

 The MCCA argued that because part of § 3104(7)(g) uses the term “may” instead of “must” in describing some of its potential powers, the MCCA has greater power than what directly follows in the statute to limit or control the individual member insurers. The MCCA wishes to conclude that since the section does not set forth a duty to act in a specific way (e.g., review claims), it allows the MCCA to act how it wants regarding member claims, including questioning their reasonableness. This is erroneous. The premise and purpose of the MCCA is to indemnify insurers for payments beyond the threshold amount, so that insurance firms of all sizes can compete in Michigan’s no-fault market without fear of sustaining disproportionate catastrophic loss claims.

 The plan of operation also echoes the statute in this regard:
If a Member or 3103 Member refuses to timely submit the reports or information required of it pursuant to Section 10.01 or otherwise, or if the Board should determine that the reports and information submitted by a Member or 3103 Member are unreliable or incomplete, the Board may, at the member’s expense, direct that an authorized representative of the Association (which may *22 be another member) shall audit and inspect such member’s records and compile the required information and data. [Art X, § 10.02.]

 Although § 3104(7)(g) states that the MCCA may “adjust or assist in the adjustment of claims,” the practical effect of § 3104(7)(g) is that only the MCCA is able to prescribe procedures and practices by which to ensure the reasonableness of the amounts that members agree to pay to claimants. When the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer. The claim that the MCCA reviews for adjustment purposes is the insured’s claim with the member insurer, not the member insurer’s reimbursement claim with the MCCA. Accordingly, the MCCA, standing in the shoes of the member insurer, is limited to the member insurer’s power to review the insured’s claim for reasonableness as spelled out in the member insurer’s policy, a settlement agreement, or a consent judgment. Thus, even when the MCCA assists in or assumes control over the claims adjustment process, the amount payable is still dictated by the amount that the member insurer is “obligated” to pay to the insured when a settlement already has been reached.