# STATE OF MICHIGAN

# COURT OF APPEALS

CHEBOYGAN SPORTSMAN CLUB,

       Plaintiff-Appellee,

v

CHEBOYGAN COUNTY PROSECUTING
ATTORNEY,

       Defendant-Appellant.

FOR PUBLICATION
October 2, 2014

No. 313902
Cheboygan Circuit Court
LC No. 12-008331-CZ

Before: RONAYNE KRAUSE, P.J., and FITZGERALD and WHITBECK, JJ.

WHITBECK, J (*concurring in part and dissenting in part*).

I agree that the trial court erred by applying the Sport Shooting Ranges Act. The majority has ably stated the background facts and procedural history in this case, and I agree that the Sport Shooting Ranges Act does not confer immunity in this case because this case does not concern an issue of noise control or noise pollution.

However, I write separately because I would not address Cheboygan Sportsman Club's alternative ground for affirmance and because I strongly disagree with the majority's method of statutory interpretation to determine that issue. Accordingly, I dissent from that portion of the majority's opinion. I would reverse and remand for further proceedings.

## I. THE SPORT SHOOTING RANGES ACT AND IMMUNITY

### A. THE SPORT SHOOTING RANGES ACT

The Legislature originally enacted the Sport Shooting Ranges Act in 1989, in response to the conflicts that the development of rural areas created between shooting ranges and new neighbors.[1] The Sport Shooting Ranges Act provides "various forms of protection to shooting ranges, including providing immunity from certain nuisance actions to shooting ranges that comply with generally accepted operation practices."[2] The Sport Shooting Ranges Act

---

[1] *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 727; 575 NW2d 63 (1997).

[2] *Id*.

-1-

specifically provides civil and criminal immunity from prosecution or nuisance actions involving noise control or noise pollution laws or ordinances:

> Notwithstanding any other provision of law, and in addition to other protections provided in this act, a person who owns or operates or uses a Sport Shooting Ranges that conforms to generally accepted operation practices in this state *is not subject to civil liability or criminal prosecution in any matter relating to noise or noise pollution* resulting from the operation or use of the range if the range is in compliance with any noise control laws or ordinances that applied to the range and its operation at the time of construction or initial operation of the range.[3]

## B. THE WILDLIFE CONSERVATION ACT

The Wildlife Conservation Act provides the authority under which the Department of Natural Resources regulates the taking of game animals.[4] The Wildlife Conservation Act provides in that "[a] person shall not hunt or discharge a firearm within 150 yards of an occupied building . . . without obtaining the written permission of the owner, renter, or occupant of the property."[5]

## C. APPLICATION OF THE SPORT SHOOTING RANGES ACT

The prosecutor contends that the trial court erred by concluding that the Sport Shooting Ranges Act applied here because this matter does not concern noise or noise pollution. I agree.

The trial court concluded that it must apply the Sport Shooting Ranges Act over the Wildlife Conservation Act because both statutes involve the discharge of firearms, and thus both were applicable in this case. However, the Sport Shooting Ranges Act provides shooting ranges immunity against noise complaints. This case does not involve noise complaints. It requires a determination of whether a prohibition against discharging a firearm within 150 yards of an occupied building is an issue of public safety or a hunting regulation under the Wildlife Conservation Act. Neither party's argument concerns noise or noise pollution. Thus, this suit is plainly not a matter "relating to noise or noise pollution," and the Sport Shooting Ranges Act does not apply. The trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from civil suit under the Sport Shooting Ranges Act.

I would therefore conclude that the trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from prosecution under the Sport Shooting Ranges Act because this action does not involve noise or noise pollution. I would reverse and remand on this ground.

---

[3] MCL 691.1542(1) (emphasis added).

[4] MCL 324.40105.

[5] MCL 324.40111(6).

## II. APPLICATION OF THE WILDLIFE CONSERVATION ACT

### A. OVERVIEW

As an alternative ground for affirmance, the Cheboygan Sportsman Club contends that the Wildlife Conservation Act does not apply because, when read in context, the statute limits only the discharge of firearms related to hunting, not range shooting. The prosecutor responds that the plain language of the specific provision is not that specific in scope, and prohibits anyone from discharging a firearm within 150 yards of an occupied building. I note that, while the Cheboygan Sportsman Club made this argument below, the trial court failed to address it and it is not the focus of the parties' briefs on appeal.

For these reasons, and although the issue is purely legal in nature, I would decline to interpret Wildlife Conservation Act   However, because the majority chooses to address the interpretation of Wildlife Conservation Act, I will also address the issue in order to dissent from the majority's method of interpretation.

### B. LEGAL STANDARDS OF STATUTORY INTERPRETATION

We in the legal profession hold firm to the belief, to the point of reducing the words to a cliché, that the primary and overriding rule of statutory interpretation is that our goal is to give effect to the intent of the Legislature.[6] At the risk of being labelled a judicial heretic, I must say that I have often found the repeated incantation of this hoary formula to be more than a little at odds with reality. The basic premise of the formula is that there is some objective, collective legislative intent that is capable of being ascertained through rational analysis.

But is this really true? Certainly, when a bill passes the Legislature, that passage is the result of collective action by both houses of that Legislature. But in each house, that *collective* action is itself the result of the *individual* actions of *individual* legislators, each casting his or her own vote. And that individual legislator action may cast his or her vote for a very, very wide variety of reasons. For example:

- The legislator and his or her staff may analyze the bill carefully and reach a conclusion about the proper way to cast his or her vote. I have no doubt that that this frequently occurs;

- But the legislator may also vote aye or nay for reasons of party loyalty; the legislator's caucus may have taken a position on the bill and the legislator may vote in concert with that caucus position without a great deal of further analysis;

- Or the legislator may perceive that an important constituency favors or opposes the bill and may vote accordingly;

---

[6] See, for example, *US Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 12; 795 NW2d 101 (2009).

- Or the language of the bill may be the product of amendment and compromise and the legislator, while having considerable doubts about the wording in one portion of the bill, may nevertheless strongly favor the provisions of another portion and may vote for the bill despite having reservations about some of its provisions;

- Or the legislator may simply follow the lead of another legislator who is a recognized authority—such as a committee chair or a ranking member—in the particular area of the law with which the bill deals;

- Or, finally, the legislator may think that the bill is unimportant and vote for it just as a means of clearing the deck for other legislation in which he or she may be more interested.

My point is a simple one: the legislative process is almost infinitely complex and the reasons for an individual legislator's vote on a particular piece of legislation can be almost infinitely variable. To suppose that a *collective* intent somehow arises out of this welter of varied individual motives is to elevate fiction over reality. It may be a useful fiction—perhaps even a necessary fiction—but it is a fiction nonetheless.

To assist us in dealing with this fiction, we have developed over the years certain conventions designed to lead us to legislative intent. Statutes provide some of these rules. For instance, MCL 8.3a provides that common words and phrases should be construed according to common meanings while technical words and phrases should be construed according to their particular meanings, and MCL 8.4b provides that catch-line headings are not part of a statute.

The judiciary has created other rules of statutory interpretation, some of which have their basis in logic. For instance, when the Legislature includes language in one part of a statute that it omits in another, we make the logical assumption that the omission was intentional.[7] Similarly, we make the equally logical assumption that a more recent statute has precedence over an older statute.[8]

Other rules have their basis in grammar. For instance, we conclude that the Legislature's use of the present perfect tense indicates that an action was started in the past and continues or has been recently completed,[9] and that a modifying clause modifies only the last antecedent clause.[10]

---

[7] See *People v Peltola*, 489 Mich 174, 185; 803 NW2d 140 (2011).

[8] See *Malcolm v City of East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991); *Parise v Detroit Entertainment*, 295 Mich App 25, 28; 811 NW2d 98 (2011).

[9] See *People v Kolanek*, 491 Mich 382, 407; 817 NW2d 528 (2012).

[10] See *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999).

As I stated above, this Court and the Michigan Supreme Court state, endlessly and perhaps even liturgically, that our goal is simply to give effect to the intent of the Legislature.[11] Again, this presumes a collective intent when, as I suggest, no such collective intent may exist. But—fortunately and perhaps because we know we are not really Galahads searching for the Holy Grail of collective legislative intent—we often follow that statement with a qualifier: the language of the *statute itself* is the primary indication of the Legislature's intent.[12] Thus, I suggest the statement that we are actually searching for a "statutory purpose" that we can glean from the words expressing that purpose is a better expression of what courts do than relying on the catch-phrase of "legislative intent."

But whatever label we use—and I acknowledge that the concept of legislative intent is firmly embedded in our jurisprudence—the problem lies in how we express the concept rather than how we apply it. Michigan courts have consistently stated that if the plain and ordinary meaning of a statute's language is clear, we will not engage in judicial construction.[13] If the statute's language is unambiguous, we must enforce the statute as written.[14]

## C. INTERPRETATION OF THE WILDLIFE CONSERVATION ACT

In very simple language, the Wildlife Conservation Act prohibits hunting *or* discharging a firearm within 150 yards of an occupied building:

> An individual shall not hunt *or* discharge a firearm within 150 yards of an occupied building, dwelling, house, residence, or cabin, or any barn or other building used in connection with a farm operation, without obtaining the written permission of the owner, renter, or occupant of the property.[15]

The majority uses the statute's preamble, legislative history, and legislative analyses to reach the conclusion that this statute does not mean what it says, but rather only means that a person may not discharge a firearm within 150 yards of an occupied building *while hunting*. Indeed, the majority's very statement of the case—that this matter involves a declaratory judgment holding that the "prohibition against discharging firearms within 150 yards of occupied residences . . . is inapplicable to plaintiff's shooting range"—illustrates the fundamental problem here. The statute does not simply prohibit discharging a firearm within 150 yards of an occupied building. It prohibits hunting *or* discharging a firearm in such a fashion. By changing the word "or" to the word "and"—and this is exactly what the majority's interpretation does—the majority is able to affirm the trial court's holding that the Wildlife Conservation Act is inapplicable to the Cheboygan Sportsman Club.

---

[11] See *US Fidelity Ins & Guaranty Co*, 484 Mich at 13.

[12] *Id*. at 12.

[13] *Id*. at 13.

[14] *Id*. at 12.

[15] MCL 324.40111(6) (emphasis added).

This interpretation runs afoul of a number of the conventions—those basic and time-honored rules of statutory interpretation—that we by necessity follow when we pursue the chimera of collective legislative intent.

Here, as I have noted, the statute provides that an individual may not "hunt *or* discharge a firearm within 150 yards of an occupied building . . . ." The Michigan Supreme Court has very recently emphasized that this Court may not ignore statutory language in favor of a more "reasonable" interpretation:

It is well established that

> [w]e have no authority to treat any part of a legislative enactment, which is not ambiguous in itself and is capable of reasonable application, as so far unimportant that it is a matter of indifference whether it is complied with or not. We must suppose the legislature saw sufficient reason for its adoption, and meant it to have effect; and whether the reason is apparent to our minds or not, we have no discretion to dispense with a compliance with the statute.[16]

That the statute appears to be inconvenient, unnecessary, or unwise is not a reason for this Court to avoid the application of plain statutory language.[17] The word "or" is a disjunctive term that prohibits *either* action.[18] Generally, this Court should follow the literal use of the term "or" unless it renders the statute dubious.[19]

Here, the word "or" does not render the statute dubious. Thus, there is no reason to avoid giving effect to the word "or." Were we to give effect to the word "or," it would prohibit both actions—hunting *or* discharging a firearm within 150 yards of an occupied building—not merely hunting. Contrary to the majority's holding, therefore, such an interpretation would mean that the Wildlife Conservation Act is applicable to the Cheboygan Sportsman Club's shooting range and prohibits target shooting on that range.

This distinction also illuminates how the majority's opinion runs afoul of another of our cherished conventions: that courts must avoid interpretations that render parts of a statute

---

[16] *People v Gaston (In re Forfeiture of Bail Bond)*, ___ Mich ___, ___; ___ NW2d ___ (2014), slip op p 17, *quoting Hoyt v East Saginaw*, 19 Mich 39, 46 (1869).

[17] *Johnson v Recca*, 492 Mich 169, 187; 821 NW2d 520 (2012); *Mich Basic Prop Ins Assn v Office of Fin & Ins Regulation*, 288 Mich App 552, 560; 808 NW2d 456 (2010).

[18] *State of Michigan v McQueen*, 293 Mich App 644, 672; 811 NW2d 513 (2011); *People v Kowalski*, 489 Mich 488, 499-500; 803 NW2d 200 (2011).

[19] *Root v Ins Co of North America*, 214 Mich App 106, 109; 542 NW2d 318 (1995).

surplusage.[20] By failing to interpret the word "or" as a disjunctive term, the majority limits the application of the Wildlife Conservation Act only to hunting, and not to discharging a firearm. The majority's interpretation thus renders "discharging a firearm" surplusage.

And, by limiting the application of the Wildlife Conservation Act to "hunting contexts and not to target practice contexts," the majority's interpretation runs afoul of yet another basic rule of statutory interpretation: that this Court may not read provisions into a statute that the Legislature chose to omit.[21] The statute does not provide any exception for target shooting on one's own property. The majority instead creates one. But had the Legislature wished to create such an exception, it could have done so. It did not create such an exception and this Court should not read such an exception into an unambiguous statue.

In creating this exception, the majority's reliance on legislative history and legislative analyses is most troubling. The Michigan Supreme Court has expressed disapproval of reliance on legislative analyses in the past, particularly when it creates a conflict with an unambiguous statute's plain language.[22] In no uncertain terms, the Court stated that, "[I]n Michigan, a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction."[23] As the Court has noted, a legislative analysis does not necessarily reflect the view of the Legislature:

> The problem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator. Rather, they are prepared by House and Senate staff. Indeed, the analyses themselves note that they do not constitute an official statement of legislative intent.[24]

There is no reason in the language of the statute itself to ignore the placement and use of the word "or" between the phrases "hunt" and "discharge a firearm." This Court should *particularly* not rely on legislative analyses to do so. Rather clearly, we are simply not free to ignore the plain language of the statute and create an exception to remake the statute into a form we find more reasonable.

## III. RESPONSE TO THE MAJORITY'S COMMENTS

The majority makes several comments in its opinion to which I am obligated to respond. First, the majority asserts that we must read statutes "in context." I take this to mean that we are

---

[20] *Baker v Gen Motors Corp*, 409 Mich 639, 665; 297 NW2d 387 (1980); *Johnson*, 492 Mich at 177.

[21] See *In re Hurd-Marvin Drain*, 331 Mich 504, 509; 50 NW2d 143 (1951); *Mich Basic Prop Ins Assn*, 288 Mich App at 560.

[22] *People v Davis*, 468 Mich 77, 79 n 1; 658 NW2d 800 (2003).

[23] *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180 (2001).

[24] *Id*. at 587 n 7.

obliged to consider not only the "surrounding statutory framework" but also legislative history and, presumably, legislative analyses. But if I am right, or mostly right, as to the dubious nature of the concept of a collective legislative intent, then such context is conceptually irrelevant. And I note that I am not alone in this critique; see Justice Antonin Scalia's comment that "[W]ith respect to 99.99 percent of the issues of construction reaching the courts, there *is* no legislative intent, so that any clues provided by legislative history are bound to be false."[25]

Second, the majority categorizes my analysis in this dissent as "an impressive academic exercise." I appreciate the kind words. But I do not regard my analysis to be at all academic in nature. Rather, I suggest, it is grounded in practical reality. Only the most innocent observer would conclude that the chaos that occurs in the Rotunda of the Capitol on the last day of a legislative session—with bills flying from one chamber to the other, with every available arm being twisted and every possible political chit being called in, with compromises being made and then unmade within a matter of minutes—is capable of producing a rational and understandable collective legislative intent as to each individual piece of legislation. This is not an academic observation; it reflects reality as I have seen it.

Third, the majority states, "Were we to disregard any established legal principle that could conceivably be thought of—inaccurately in this case, we believe—as a 'fiction,' the result would be chaos." I am not a proponent of chaos nor do I propose to disregard established legal principles. Rather, my critique of the majority's approach is that disregards time-honored principles of statutory construction to reach a result contrary to the actual words of the statute construed according to such principles.

Finally, the majority states that, "We prefer an organic approach to what is really an organic challenge."[26] I am not certain that I understand what this sentence means. But if it means that the word "or" in a statute actually means "and" when considered organically, I obviously disagree.

## IV. CONCLUSION

I agree with the majority that the trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from prosecution under the Sport Shooting Ranges Act because this action does not involve noise or noise pollution. On that basis, I would reverse and remand for further proceedings.

---

[25] Scalia, *A Matter of Interpretation,* Princeton University Press, 17 (1997) (emphasis in original).

[26] See, similarly, the majority's statement that, " . . . we nevertheless do not share our colleague's departure from established precedent that recognizes that collective entities can be, though simple and well-understood principles of group dynamics, effectively discrete entities unto themselves and subject to analysis in their own right."

But I would not graft an interpretation onto the Wildlife Conservation Act (1) that suggests that a person may not discharge a firearm within 150 yards of an occupied building *while hunting*, (2) that thereby limits the application of the Wildlife Conservation Act only to hunting, and not to discharging a firearm, rendering the "discharging a firearm" language of the statute surplusage, (3) that reads provisions into the statute that the Legislature chose to omit, and (4) that relies on the exceedingly frail reeds of legislative history and legislative analyses to reach this result.

The majority states that, "We hold *only* that MCL 234.4011 [the Wildlife Conservation Act] applies to hunting contexts and not to target practice contexts, so the act of conducting target practice shooting on plaintiff's [Cheboygan Sportsman Club's] does not violate MCL 324.4011." Actually, the majority's opinion is simply that the Wildlife Conservation Act applies *only* to hunting and *therefore* target practice shooting is not prohibited. The clear wording of the statute is otherwise. I therefore respectfully dissent from the majority's method of interpretation of the Wildlife Conservation Act.

/s/ William C. Whitbeck