*In re* APPLICATION OF CONSUMERS ENERGY COMPANY
FOR RECONCILIATION OF 2009 COSTS (ON RECONSIDERATION)

Docket Nos. 305066 and 305083. Submitted March 12, 2014, at Lansing.
Decided September 25, 2014, at 9:05 a.m. Leave to appeal sought.

Consumers Energy Company applied for approval from the Public
Service Commission of its 2009 power supply cost recovery (PSCR)
reconciliation plan. Several parties intervened in the action includ-
ing the Attorney General and TES Filer City Station Limited
Partnership (TES), which operates a biomass electric generating
plant in Filer City. Under Public Act 286 of 2008, biomass plants
may recover fuel and operation and maintenance costs that are not
covered by existing contracts with electric utilities, and the utili-
ties may recover those additional payments from their ratepayers.
TES asserted entitlement under these provisions to $636,073 in
costs for nitrogen oxide (NOx) allowances that it was required to
purchase. The Attorney General separately challenged Consum-
ers' transfer price calculations, asserting that in the reconciliation
proceeding, the transfer costs had to be reduced to reflect actual
prices paid. The Public Service Commission ultimately approved
Consumers' application with some modifications. The Public Ser-
vice Commission rejected TES's petition for NOx allowance costs
and also rejected the Attorney General's position concerning
Consumer's calculation of the transfer price. The Attorney Gen-
eral (Docket No. 305083) and TES (Docket No. 305066) filed
separate appeals, which the Court of Appeals consolidated. The
Court of Appeals affirmed, but later granted reconsideration.

The Court of Appeals *held*:

1. Biomass plants may recover fuel and operation and mainte-
nance costs that are not covered by existing contracts with electric
utilities. MCL 460.6a(8) states that the total aggregate additional
amounts recoverable in excess of the amounts paid under the
contracts may not exceed $1 million a month for each affected
utility, but that general limit does not apply with respect to actual
fuel and variable operation and maintenance costs that are in-
curred due to changes in federal or state environmental laws or
regulations that are implemented after the effective date of the
statute. MCL 460.6a(8), thus, compares the effective date of MCL
460.6a(8)—October 6, 2008—with the date of any changes in state

or federal environmental rules. A rule is implemented on its effective date, which may or may not coincide with the date the rule is promulgated. In 2005, the federal Environmental Protection Agency (EPA) promulgated the Clean Air Interstate Rule, which required states to revise their state implementation plans to reduce NOx emissions. Michigan filed its revised regulations, which required TES to begin purchasing NOx allowances, with the Secretary of State on June 25, 2007. The rule at issue—Mich Admin Code, R 336.1803—became effective immediately upon filing. The fact that the rule may not have been enforceable until it was subsequently approved by the EPA in 2009 is not controlling because the rule was substantively changed in 2007. Therefore, the rule was implemented before October 6, 2008, the exception for costs incurred as a result of changes in environmental laws did not apply, and the Public Service Commission did not err by rejecting TES's petition for NOx allowance costs.

2. The Clean, Renewable, and Efficient Energy Act, 2008 PA 295, requires electric utilities to adopt renewable energy plans and provides that utilities may recover renewable energy costs, including by recovering the transfer price, i.e., the estimated cost of the energy if acquired from conventional sources, through a PSCR clause. MCL 460.1047(2)(b)(*iv*) establishes the formula for determining the transfer price. The Public Service Commission correctly rejected the Attorney General's arguments regarding the transfer price. Consumers' calculation of the transfer price was consistent with prior Public Service Commission orders, including the order entered in Consumers' renewable energy plan case, and the act did not give the Public Service Commission authority to change the approved transfer price in this PSCR proceeding.

Affirmed.

WHITBECK, J., concurring in part and dissenting in part, disagreed with the majority's conclusion in Docket No. 305066 that the administrative rules requiring generators to purchase NOx allowances were implemented in 2007, and would have reversed the Public Service Commission's determination that TES was not entitled to recover its costs under MCL 460.6a(8), but he concurred in the majority opinion in all other respects. The word "implemented" means to fulfill, carry out, or to put into effect according to a definite plan or procedure. Although Michigan may have promulgated Rule 336.1803(3) in 2007, Michigan conditioned the rule on EPA approval, and the EPA did not give final approval to Michigan's revised state implementation plan until 2009. Therefore, Rule 336.1803(3) was not effective until 2009. Because the rule was not implemented

until 2009, the exception in MCL 460.6a(8) applied, and TES should have been permitted to recover the costs of purchasing the NOx allowances.

1. PUBLIC UTILITIES — BIOMASS PLANTS — RECOVERY OF FUEL, OPERATION, AND MAINTENANCE COSTS — IMPLEMENTATION OF CHANGES IN ENVIRONMENTAL LAWS OR REGULATIONS.

Biomass plants may recover fuel and operation and maintenance costs that are not covered by existing contracts with electric utilities; under MCL 460.6a(8), the total aggregate additional amounts recoverable in excess of the amounts paid under the contracts may not exceed $1 million a month for each affected utility, but that general limit does not apply with respect to actual fuel and variable operation and maintenance costs that are incurred because of changes in federal or state environmental laws or regulations that are implemented after October 6, 2008; a rule is implemented on its effective date, which may or may not coincide with the date the rule is promulgated.

2. PUBLIC UTILITIES — RECOVERY OF RENEWABLE ENERGY COSTS — TRANSFER PRICE — POWER SUPPLY COST RECOVERY RECONCILIATION PROCEEDINGS.

The Clean, Renewable, and Efficient Energy Act, 2008 PA 295, requires electric utilities to adopt renewable energy plans and provides that utilities may recover renewable energy costs, including by recovering the transfer price, i.e., the estimated cost of the energy if acquired from conventional sources, through a power supply recovery cost (PSCR) clause; MCL 460.1047(2)(b)(*iv*) establishes the formula for determining the transfer price; the act does not give the Public Service Commission authority to change the approved transfer price in PSCR reconciliation proceeding.

*Fraser Trebilcock Davis & Dunlap, PC* (by *David E. S. Marvin*), for TES Filer City Station Limited Partnership.

*Bill Schuette*, Attorney General, *S. Peter Manning*, Division Chief, and *Donald E. Erickson*, Assistant Attorney General, for the Attorney General.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal

Counsel, and *Steven D. Hughey* and *Patricia S. Barone*, Assistant Attorneys General, for the Public Service Commission.

*John C. Shea* and *Raymond E. McQuillan* for Consumers Energy Company.

ON RECONSIDERATION

Before: RONAYNE KRAUSE, P.J., and FITZGERALD and WHITBECK, JJ.

RONAYNE KRAUSE, P.J. In these consolidated cases appellants TES Filer City Station Limited Partnership and the Attorney General claim appeals from an order of the Michigan Public Service Commission (PSC) in Consumers Energy Company's power supply cost recovery (PSCR) case. We affirm.

I. UNDERLYING FACTS AND PROCEEDINGS

On March 31, 2010, Consumers filed an application with the PSC seeking approval of its PSCR and revenues for the calendar year 2009.[1] Consumers sought an underrecovery of $34,378,062, including interest.[2]

---

[1] Generally, an electric utility can recover its power supply costs through either base rates, which are established in a general rate case, MCL 460.6a(2)(b), or a PSCR clause. A PSCR clause is "a clause in the electric rates or rate schedule of a utility which permits the monthly adjustment of rates for power supply to allow the utility to recover the booked costs, including transportation costs, reclamation costs, and disposal and reprocessing costs, of fuel burned by the utility for electric generation and the booked costs of purchased and net interchanged power transactions by the utility incurred under reasonable and prudent policies and practices." MCL 460.6j(1)(a).

[2] The following parties, among others, were granted intervenor status: the Attorney General, the Michigan Environmental Council, and the Biomass Merchant Plants [BMPs] (specifically, Cadillac Renewable Energy, LLC; Genesee Power Station Limited Partnership; Grayling Gen-

The parties raised numerous issues at the hearing stage. However, these consolidated appeals focus on two issues: (1) the eligibility of TES Filer City to recover nitrogen oxide (NOx) allowance costs, and (2) the transfer price calculation.

### A. TES FILER CITY NOx COSTS

Biomass plants generate electricity in whole or in part from wood waste. Public Act 286 of 2008, which became effective on October 6, 2008, enacted provisions to allow biomass plants to recover fuel and operation and maintenance (O&M) costs that are not covered by existing contracts with electric utilities. The relevant subsections, MCL 460.6a(7) to (9), provide:

> (7) If, on or before January 1, 2008, a merchant plant entered into a contract with an initial term of 20 years or more to sell electricity to an electric utility whose rates are regulated by the commission with 1,000,000 or more retail customers in this state and if, prior to January 1, 2008, the merchant plant generated electricity under that contract, in whole or in part, from wood or solid wood wastes, then the merchant plant shall, upon petition by the merchant plant, and subject to the limitation set forth in subsection (8), recover the amount, if any, by which the merchant plant's reasonably and prudently incurred actual fuel and variable operation and maintenance costs exceed the amount that the merchant plant is paid under the contract for those costs. This subsection does not apply to landfill gas plants, hydro plants, municipal solid waste plants, or to merchant plants engaged in litigation against an electric utility seeking higher payments for power delivered pursuant to contract.

> (8) The total aggregate additional amounts recoverable by merchant plants pursuant to subsection (7) in excess of

erating Station Limited Partnership; Hillman Power Company, LLC; TES Filer City Limited Partnership; Viking Energy of Lincoln, Inc.; and Viking Energy of McBain, Inc.).

the amounts paid under the contracts shall not exceed $1,000,000.00 per month for each affected electric utility. The $1,000,000.00 per month limit specified in this subsection shall be reviewed by the commission upon petition of the merchant plant filed no more than once per year and may be adjusted if the commission finds that the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs exceed the amount that those merchant plants are paid under the contract by more than $1,000,000.00 per month. The annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index. An adjustment shall not be made by the commission unless each affected merchant plant files a petition with the commission. As used in this subsection, "United States consumer price index" means the United States consumer price index for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics. If the total aggregate amount by which the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs determined by the commission exceed the amount that the merchant plants are paid under the contract by more than $1,000,000.00 per month, the commission shall allocate the additional $1,000,000.00 per month payment among the eligible merchant plants based upon the relationship of excess costs among the eligible merchant plants. The $1,000,000.00 limit specified in this subsection, as adjusted, shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection. The $1,000,000.00 per month payment limit under this subsection shall not apply to merchant plants eligible under subsection (7) whose electricity is purchased by a utility that is using wood or wood waste or fuels derived from those materials for fuel in their power plants.

(9) The commission shall issue orders to permit the recovery authorized under subsections (7) and (8) upon

petition of the merchant plant. The merchant plant shall not be required to alter or amend the existing contract with the electric utility in order to obtain the recovery under subsections (7) and (8). The commission shall permit or require the electric utility whose rates are regulated by the commission to recover from its ratepayers all fuel and variable operation and maintenance costs that the electric utility is required to pay to the merchant plant as reasonably and prudently incurred costs.

Certain provisions in the federal Public Utility Regulatory Policies Act (PURPA) are designed to encourage power production by small power production facilities. The legislation directs the Federal Energy Regulatory Commission (FERC) to promulgate rules requiring electric utilities to sell electricity to and purchase electricity from small facilities, also known as qualifying facilities. 16 USC 824a-3. A regulation promulgated by FERC provides that "[n]othing in this subpart requires any electric utility to pay more than the avoided costs for purchases." 18 CFR 292.304(a)(2) (2014).[3] The BMPs are qualifying facilities (QFs) under PURPA.

MCL 460.6a(8) provides that the $1,000,000 per month payment limit did not apply with respect to costs "incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection."[4] TES Filer sought recovery of $636,073, the cost of purchasing seasonal and annual NOx allow-

---

[3] In the FERC regulations, "avoided costs" are defined as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 CFR 292.101(b)(6) (2014).

[4] Federal law requires states to develop state implementation plans (SIPs). 42 USC 7410. These plans are approved by the Environmental Protection Agency. The Michigan Department of Environmental Quality sets state air quality standards. The Clean Air Interstate Rule (CAIR),

ances in 2009. TES Filer claimed that its NOx allowance expenses resulted from Michigan's state implementation plan (SIP); TES Filer asserted that the SIP became effective on October 19, 2009, the date the federal Environmental Protection Agency (EPA) approved rules promulgated by the Michigan Department of Environmental Quality (DEQ), or on November 30, 2009, the date by which generators of NOx emissions were required to have purchased seasonal allowances for 2009.[5]

The PSC concluded that TES Filer was not eligible to recover the costs of the NOx allowances that it purchased in 2009. The PSC acknowledged that the EPA did not approve Michigan's revised SIP (which required TES Filer to begin purchasing NOx allowances) until August 18, 2009; but the changes to state environmental regulations took place on June 25, 2007, the date the revised rules were filed with the Secretary of State. The PSC concluded that Michigan implemented the CAIR requirements when the revised rules were filed with the Secretary of State; therefore, the change in state law took place before October 6, 2008, the date that Public Act 286 was implemented.

### B. TRANSFER PRICE CALCULATION

Under 2008 PA 295, a utility may recover the cost of renewable energy that it purchases. A portion of those costs must be recovered through the PSCR process. MCL 460.1047(2)(b)(*iv*) establishes the formula for determining the transfer price, i.e., the estimated cost of the energy

---

which the federal Environmental Protection Agency promulgated in 2005, see 70 Fed Reg 25162 (May 12, 2005), required states to revise their SIPs to reduce emissions of NOx.

[5] TES Filer asserted that "implemented" as used in MCL 460.6a(8) meant "completed, fulfilled, and put into effect."

if acquired from conventional sources. It is the transfer costs that must be recovered through the PSCR process. MCL 460.1047(2)(b)(*iv*) provides in pertinent part:

> After providing an opportunity for a contested case hearing for an electric provider whose rates are regulated by the commission, the commission shall annually establish a price per megawatt hour. In addition, an electric provider whose rates are regulated by the commission may at any time petition the commission to revise the price. In setting the price per megawatt hour under this subparagraph, the commission shall consider factors including, but not limited to, projected capacity, energy, maintenance, and operating costs; information filed under section 6j of 1939 PA 3, MCL 460.6j; and information from wholesale markets, including, but not limited to, locational marginal pricing. This price shall be multiplied by the sum of the number of megawatt hours of renewable energy and the number of megawatt hours of advanced cleaner energy used to maintain compliance with the renewable energy standard. The product shall be considered a booked cost of purchased and net interchanged power transactions under section 6j of 1939 PA 3, MCL 460.6j. For energy purchased by such an electric provider under a renewable energy contract or advanced cleaner energy contract, the price shall be the lower of the amount established by the commission or the actual price paid and shall be multiplied by the number of megawatt hours of renewable energy or advanced cleaner energy purchased. The resulting value shall be considered a booked cost of purchased and net interchanged power under section 6j of 1939 PA 3, MCL 460.6j.

The transfer price is established in annual renewable energy plan reconciliation proceedings. MCL 460.1049(3)(c).

Consumers presented evidence that its average transfer price in 2009 was approximately $44.80 per megawatt-hour (MWh), and asserted that it incurred $90,000 in total transfer costs. The Attorney General sought to reduce Consumers' total transfer cost calculation by $39,715,

arguing that the transfer price should reflect the prices forecast in the plan case and the actual prices Consumers paid during the plan period.

The PSC found that Consumers' calculation of its transfer price was consistent with prior orders and that no further price adjustment was warranted. In addition, the PSC found that it had no statutory authority to recalculate the transfer price in a PSCR case.

The PSC's order concluded as follows:

> The Commission approves Consumers' application for its 2009 PSCR reconciliation, with the following modifications: (1) a disallowance of $2,140,882 related to the Whiting 3 outage; and (2) a disallowance of $263,040 related to the deviation from the 2009 PSCR plan for spot and contract coal purchases. The Commission approves payments to the BMPs in the amount of $14,838,711. In addition, Consumers is directed in its next plan case to provide an analysis of the economic dispatching of its generation assets, and, in its next case in which statutory payments to BMPs are considered, to explore possible objective criteria to apply to BMP costs in evaluating the reasonableness and prudence of those costs.

### II. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well defined. Under MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its

discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

A reviewing court gives due deference to the PSC's administrative expertise, and is not to substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). This Court gives respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute, and this Court will not overrule that construction absent cogent reasons. If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining the legislative intent, and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute by the PSC is not binding on us. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103-109; 754 NW2d 259 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

III. ANALYSIS

A. DOCKET NO. 305066

TES Filer is an electric-generating unit[6] located in

---

[6] See Mich Admin Code, R 336.1803(1)(a)(i).

Filer City, Manistee County, Michigan. The 2007 rules did not place Manistee County in Michigan's fine grid zone, i.e., the geographical area to which the state and federal rules implemented in 2007 applied. Mich Admin Code R 336.1803(1)(c). However, the rules indicated that electric-generating units such as TES Filer that were located outside the fine grid zone would be subject to the rules for the 2009 NOx season. Mich Admin Code, R 336.1803(3)(o). As a result, TES Filer incurred NOx allowance costs in the amount of $636,073 in November and December 2009.

On appeal, TES Filer argues that the PSC erred by ignoring the significance of the word "implemented" in MCL 460.6a(8). TES Filer asserts that the common meaning of the word "implemented" is "to have fulfilled, carried out, or effectuated a plan." TES Filer notes that the rules promulgated by the DEQ in 2007 did not impose new regulations at that time, but were intended to do so in 2009; accordingly, the PSC should have concluded that the 2007 rules, even if in effect during the relevant period, were not implemented during that same period. Rather, according to TES Filer, the rules were implemented after MCL 460.6a(8) went into effect; therefore, TES Filer was entitled to recover its costs. We disagree.

TES Filer ignores the context surrounding the word "implemented" in the statutory scheme. This Court does not read statutory provisions in isolation, but instead considers them in context. *Robinson v Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). The NOx emission rules that were applicable to TES Filer did not change after October 6, 2008, the date that MCL 460.6a(8) went into effect. At issue in this case is not the meaning of the term "implemented," but rather on what date TES Filer was affected by the NOx emission

rules. In context, MCL 460.6a(8) provides that the limit does not apply to specified costs "that are incurred *due to changes* in federal or state environmental laws or regulations that are *implemented after the effective date* of the amendatory act that added this subsection." (Emphasis added.) MCL 460.6a(8) compares the effective date of the statute and the date of any changes in state or federal environmental rules. It is undisputed that MCL 460.6a(8) went into effect on October 6, 2008. The DEQ promulgated rules by filing them with the Secretary of State on June 25, 2007. MCL 24.246(1). The DEQ's rules became effective before October 6, 2008.

Our dissenting colleague accurately points out that "promulgation" is a term of art, defined as "that step in the processing of a rule consisting of the filing of a rule with the secretary of state." MCL 24.205(9). In turn, " '[p]rocessing of a rule' means the action required or authorized by [the Administrative Procedures Act] regarding a rule that is to be promulgated, including the rule's adoption, and ending with the rule's promulgation." MCL 24.205(8). " 'Adoption of a rule' means that step in the processing of a rule consisting of the formal action of an agency establishing a rule before its promulgation." MCL 24.203(1). Obviously, then, promulgation is simply one step in a process. We cannot find any definition of "implemented" in any relevant statutes, but we agree with our dissenting colleague that it is reasonable to presume that it means something different from "promulgated." We do not, however, perceive any reason why promulgation and implementation cannot occur contemporaneously, particularly because promulgation does *not* establish when a rule goes into effect: absent exceptional circumstances, "a rule becomes effective on the date fixed in the rule, which shall not be earlier than 7 days after the date of its promul-

gation, or if a date is not so fixed then 7 days after the date of promulgation." MCL 24.247(1).

In other words, we agree with our dissenting colleague that a rule is not *necessarily* "implemented" when it is "promulgated," because by statute, promulgation is merely the final procedural stage of processing a rule to the point of filing it with the Secretary of State. Because "implement" is not defined by statute, we consider it to have its common dictionary meaning. *Oakland Co Bd of Co Road Comm'rs v Mich Prop & Cas Guarantee Ass'n*, 456 Mich 590, 604; 575 NW2d 751 (1998). As a verb, to "implement" means "to fulfill," to "carry out," or "to put into effect according to a definite plan or procedure." *Random House Webster's College Dictionary* (2001). We do not believe that any particular person or entity needs to feel the effect of a law or a rule for it to be "implemented." Rather, we conclude that the most principled way to determine when a rule or law has been "implemented" is to refer to the effective date thereof. It may be that this will often coincide with the date it is promulgated, but there is no reason why it must be contemporaneous. We therefore do not treat "implement" and "promulgate" as synonyms.

The DEQ rule at issue, Mich Admin Code, R 336.1803, was published on July 15, 2007, in Volume 12 of the Michigan Register. The Michigan Register states that it was one of several rules that "were filed with Secretary of State on June 25, 2007," and that the rules became effective immediately upon filing.[7] 2007 Mich Reg 12, pp 2-24. Because the DEQ's rules became effective in 2007, we conclude that the rules were

---

[7] The Michigan Register further provided that any rules adopted under MCL 24.233, MCL 24.244, or MCL 24.245a(6) would become effective 7 days after filing, but no rules adopted under those statutes are at issue here.

"implemented" in 2007. The fact that TES Filer only became subject to those rules in 2009 does not affect when the rules were implemented because no substantive change to the rules occurred at that time. The rules were therefore implemented before October 6, 2008.

In our prior opinion, we neglected to make explicit mention of TES Filer's alternative argument—that the 2007 rules were not enforceable at the time it incurred its first NOx allowance cost because the 2007 rules were unenforceable until approved by the EPA, the EPA had disapproved the 2007 rules, and the NOx costs were incurred pursuant to the revised 2009 rules. We granted reconsideration to correct this oversight. However, TES Filer's argument in part merely restates its previously discussed confusion between the date a law is changed and the date it becomes enforceable, and in fact by the time TES Filer incurred NOx costs, the EPA had explicitly approved the 2007 rules. See 74 Fed Reg 41640 (August 18, 2009). In essence, TES Filer's "alternative" argument is simply a variation on its argument that the rules were "implemented" in 2009 because that was when TES Filer became subject to those rules. As discussed, we find that the rules were substantively changed in 2007, irrespective of when TES Filer became subject to them. Therefore, although we granted reconsideration to correct our failure to specifically address this argument, TES Filer's motion for reconsideration has not established a substantive palpable error, and our conclusions remain unchanged. We conclude that TES Filer was not entitled to recover its NOx emission costs.

### B. DOCKET NO. 305083

The Attorney General argues that the PSC erred by transferring more for renewable energy costs than the

amount that reflected actual PSCR expenses incurred during the reconciliation period. According to the Attorney General, the PSC improperly calculated transfer costs that are recoverable under MCL 460.6j and MCL 460.1049(3)(c) and incremental costs that are recoverable under MCL 460.1045(2). The Attorney General states that the PSC must establish a transfer price in renewable energy and PSCR case plans and a per MWh price in renewable energy and PSCR reconciliation cases. We disagree.

The Clean, Renewable, and Efficient Energy Act, 2008 PA 295, MCL 460.1001 *et seq.*, became effective on October 6, 2008. The act created renewable energy portfolio standards that utilities such as Consumers were required to meet over the next 20 years. See MCL 460.121(2)(c); MCL 460.1027. Utilities can recover the costs of the renewable energy program. MCL 460.1047(2)(b)(*iv*) allocates renewable energy costs between PSCR costs and incremental costs by establishing a transfer price that may be recovered through a PSCR clause. This subparagraph provides in pertinent part:

> After providing an opportunity for a contested case hearing for an electric provider whose rates are regulated by the commission, the commission shall annually establish a price per megawatt hour. In addition, an electric provider whose rates are regulated by the commission may at any time petition the commission to revise the price. In setting the price per megawatt hour under this subparagraph, the commission shall consider factors including, but not limited to, projected capacity, energy, maintenance, and operating costs; information filed under section 6j of 1939 PA 3, MCL 460.6j; and information from wholesale markets, including, but not limited to, locational marginal pricing. This price shall be multiplied by the sum of the number of megawatt hours of renewable energy and the number of megawatt hours of advanced cleaner energy used to main-

tain compliance with the renewable energy standard. The product shall be considered a booked cost of purchased and net interchanged power transactions under section 6j of 1939 PA 3, MCL 460.6j. For energy purchased by such an electric provider under a renewable energy contract or advanced cleaner energy contract, the price shall be the lower of the amount established by the commission or the actual price paid and shall be multiplied by the number of megawatt hours of renewable energy or advanced cleaner energy purchased. The resulting value shall be considered a booked cost of purchased and net interchanged power under section 6j of 1939 PA 3, MCL 460.6j.

As noted, the PSC refers to this price as the transfer price. The PSC establishes this price in a utility's annual renewable energy plan reconciliation proceeding. MCL 460.1049(3)(c). Consumers asserted that its transfer price was approximately $44.80 per MWh, and sought recovery of $90,973 in transfer costs.

The Attorney General sought to reduce the amount recovered by Consumers by $39,715. The Attorney General argued that the transfer price used by Consumers to determine PSCR costs in this case should be "reduced by 45% to reflect the difference between the locational marginal prices forecasted in the plan case and the actual prices paid during the plan period." The Attorney General took the position that, because Consumers was obligated to meet its economic dispatch requirements with the lowest-cost energy available, and because transfer costs should not exceed the actual costs that Consumers would have incurred if renewable energy resources had not been available, the transfer price should be recalculated in the instant PSCR case to ensure that Consumers' PSCR customers were not subsidizing the recovery of renewable energy costs.

The Attorney General's arguments are without merit. The PSC determined that Consumers' calculation of the transfer price was consistent with the method used in prior PSC orders, including the order entered in Consumers' renewable energy plan case. See *In re Consumers Energy Co*, order of the Public Service Commission, entered October 13, 2009 (Case No. U-15805). The PSC correctly noted that the act gave it no authority to change the already approved transfer price in a PSCR proceeding. The Attorney General points to no statutory authority that requires the PSC to recalculate the transfer price in a PSCR proceeding. Essentially, the Attorney General argues that the PSC should have adopted the testimony of its expert witness regarding the interpretation and application of the relevant statutes rather than accepting the testimony of Consumers' witness. However, "the PSC can properly rely on the testimony of a qualified expert and that testimony constitutes competent evidence . . . ." *Attorney General v Public Serv Comm*, 174 Mich App 161, 170; 435 NW2d 752 (1988). The Attorney General has not demonstrated the existence of cogent reasons that would support this Court overturning the PSC's application of the relevant statutes. See *Rovas*, 482 Mich at 103-109.

The PSC correctly rejected the Attorney General's assertion that the transfer price relied on by Consumers should be recalculated in the context of the instant PSCR case.

### IV. CONCLUSION

In Docket No. 305066, we affirm that portion of the PSC's order that disallowed recovery of NOx allowances requested by TES Filer.

In Docket No. 305083, we affirm the PSC's rejection of the Attorney General's challenge to the calculation of the transfer price relied on by Consumers.

Affirmed.

FITZGERALD, J., concurred with RONAYNE KRAUSE, P.J.

WHITBECK, J. (*concurring in part and dissenting in part*). I respectfully disagree with the majority's conclusion in Docket No. 305066 that the administrative rules requiring generators to purchase nitrogen oxide (NOx) allowances were implemented in 2007. Accordingly, I would reverse with respect to the Public Service Commission's determination that the rules were implemented in 2007 and that TES Filer City Station Limited Partnership (TES Filer) was not entitled to recover its costs under MCL 460.6a(8). In all other respects, I concur in the majority's opinion.

### I. STATUTORY INTERPRETATION

#### A. STANDARD OF REVIEW

This Court reviews de novo issues of statutory interpretation.[1]

#### B. LEGAL STANDARDS

If the plain and ordinary meaning of a statute's language is clear, we will not engage in judicial construction.[2] When interpreting a statute, our goal is to give effect to the intent of the Legislature.[3] The language

---

[1] *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 12; 795 NW2d 101 (2009).

[2] *People v Breidenbach*, 489 Mich 1, 8; 798 NW2d 738 (2011).

[3] *US Fidelity & Guaranty Co*, 484 Mich at 13.

of the statute itself is the primary indication of the Legislature's intent.[4] If the language of the statute is unambiguous, we must enforce the statute as written.[5]

### C. APPLYING THE STANDARDS

TES Filer contends that the Public Service Commission erred because MCL 460.6a(8) provides that the $1,000,000 limit does not apply to costs incurred due to changes in the regulatory laws that are implemented after the effective date of 2008 PA 286. According to TES Filer, it could not have incurred its 2009 NOx allowance costs under the Michigan Department of Environmental Quality's 2007 rules because those rules were not in effect when TES Filer purchased its 2009 NOx allowances. I agree with TES Filer.

#### 1. CHANGES IMPLEMENTED AFTER MCL 460.6a

The meaning of the word implemented is crucial to determining whether MCL 460.6a(8) applied to TES Filer's NOx allowance costs because application of the exception in MCL 460.6a(8) hinges on when new laws or regulations are implemented.

MCL 460.6a(8) provides that "[t]he total aggregate additional amounts recoverable by merchant plants . . . shall not exceed $1,000,000.00 per month for each affected utility." However, MCL 460.6a(8) also provides an exception to this limit:

> The $1,000,000.00 limit specified in this subsection, as adjusted, shall not apply with respect to actual fuel and variable operation and maintenance costs that are *incurred*

---

[4] *Id.*

[5] *Id.* at 12-13.

*due to changes* in federal or state environmental laws or regulations *that are implemented* after [October 6, 2008].[6]

TES Filer's argument hinges around the meaning of the word "implemented" in this exception. If the Legislature has chosen words that "have acquired a peculiar and appropriate meaning in the law," we construe those terms according to their legal meanings.[7] But when the Legislature does not define a term, we may consider a dictionary definition to determine the word's plain and ordinary meaning.[8] We presume that the Legislature is aware of existing statutes.[9] And "[t]he Court may not assume that the Legislature inadvertently made use of one word or phrase instead of another."[10]

The word "promulgation" is a legal term of art. " 'Promulgation of a rule' means that step in the processing of a rule consisting of the filing of the rule with the secretary of state."[11] "To promulgate a rule the state office of administrative hearing and rules shall file in the office of the secretary of state 3 copies of the rule bearing the required certificates of approval and adoption, true copies of the rule without the certificates, and 1 electronic copy."[12] "[A] rule becomes effective on the date fixed in the rule . . . ."[13]

If the Legislature had meant "implemented" to have the meaning of the word "promulgated," the Legisla-

---

[6] Emphasis added.

[7] *Feyz v Mercy Mem Hosp*, 475 Mich 663, 673; 719 NW2d 1 (2006).

[8] *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999).

[9] *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993).

[10] *Robinson v Detroit*, 462 Mich 439, 459; 613 NW2d 307 (2000).

[11] MCL 24.205(9).

[12] MCL 24.246(1).

[13] MCL 24.247(1).

ture would have used the word "promulgated." We must presume that the Legislature was aware that the term existed. Indeed, it was defined in another act: the Administrative Procedures Act, MCL 24.201 *et seq.*, an act that sets out the procedures for rulemaking. Thus, promulgation is defined in a statute that bears directly on the subject of MCL 460.6a(8).

But the Legislature did not choose to use the word promulgated. Instead, the Legislature used the general term "implemented." We may not presume that this choice was an error. Accordingly, I conclude that the Legislature did not mean for the exception in MCL 460.6a(8) to apply on the basis of when a rule was promulgated, but rather intended it to apply on the basis of when the rule was *implemented*.

When used as a transitive verb, implement means "to fulfill; carry out" or "to put into effect according to a definite plan or procedure."[14] Applying these definitions of the word "implemented," I read MCL 460.6a(8) as stating that the $1,000,000 limit does not apply with respect to costs that are incurred due to changes in laws or regulations that are *put into effect* after October 6, 2008. I conclude that MCL 460.6a(8) controls, and it clearly provides that the limit does not apply to TES Filer if it incurred costs due to a rule change that was *put into effect* after October 6, 2008, the effective date of MCL 460.6a.

### 2. WHEN WAS THE RULE EFFECTIVE?

The question then becomes: Was the rule that required TES Filer to purchase NOx allowances put into effect before or after October 6, 2008? I conclude that

---

[14] *Random House Webster's College Dictionary* (2005).

the rule was not effective until 2009, and therefore the rule was not "implemented" until 2009.

The Michigan Department of Environmental Quality adopted the definitions of the Environmental Protection Agency when it promulgated the rule requiring NOx allowances.[15] The Environmental Protection Agency defined "CAIR NOx allowance" as "a limited authorization issued by a permitting authority ... under provisions of a State implementation plan that are approved [by the Environmental Protection Agency] . . . ."[16]

On December 20, 2007, the Environmental Protection Agency approved the Michigan Department of Environmental Quality's 2007 state implementation plan rules on the condition that the Michigan Department of Environmental Quality would submit a corrected plan to the Environmental Protection Agency within one year.[17] The Michigan Department of Environmental Quality did not submit a corrected plan, and the conditional approval lapsed on December 20, 2008.[18] The Michigan Department of Environmental Quality "completed the State adoption process for the rules" on April 13, 2009.[19] It then submitted the revised state implementation plan to the Environmental Protection Agency for approval on June 10, 2009.[20] The Environ-

---

[15] Mich Admin Code, R 336.1803(3), incorporating by reference definitions in 40 CFR 97.102 and 40 CFR 97.302.

[16] 40 CFR 97.102 (2013).

[17] Environmental Protection Agency, *Approval of Implementation Plans of Michigan: Clean Air Interstate Rule*, 72 Fed Reg 72256, § I (December 20, 2007).

[18] Environmental Protection Agency, *Approval of Implementation Plans of Michigan: Clean Air Interstate Rule*, 74 Fed Reg 41637, 41638, § I (August 18, 2009).

[19] *Id.*

[20] *Id.*

mental Protection Agency approved the June 10, 2009 submittal in conjunction with the July 16, 2007 submittal, and declined to revisit the July 16, 2007 submittal on its own.[21]

I conclude that Rule 336.1803(3) was not effective until 2009. Rule 336.1803(3) adopted the federal definition of the term "NOx allowance." The federal definition provided that such an allowance was a limited authorization *under the provisions of a state implementation plan.*[22] The Environmental Protection Agency did not approve Michigan's state implementation plan until 2009. Accordingly, there was no stated implementation plan under which NOx allowances existed. To put it another way, there were no limited NOx allowances under a state implementation plan because no such plan existed.

Given these provisions, I cannot conclude that the rule was "implemented" in 2007. I do not see how the rule can apply to TES Filer if the Michigan Department of Environmental Quality conditioned the rule on EPA approval, and the EPA did not approve the rule until August 18, 2009. The Michigan Department of Environmental Quality may have promulgated the rules in 2007, but the NOx limitations were not *implemented* until 2009.

## II. CONCLUSION

I conclude that the word "implemented" in MCL 460.6a(8) does not have the same meaning as the word "promulgated." I also conclude that the NOx requirements were not implemented until 2009 because they were not effective until 2009. Therefore, the exception

---

[21] *Id.*

[22] 40 CFR 97.102 (2013).

in MCL 460.6a(8) applied to TES Filer. I conclude that the Public Service Commission erred when it determined that TES Filer was not allowed to recover the costs of purchasing NOx allowances. I therefore respectfully dissent from the majority's contrary conclusion in Docket No. 305066.