# STATE OF MICHIGAN

# COURT OF APPEALS

In re Application of CONSUMERS ENERGY
COMPANY for 2012 Reconciliation.

CADILLAC RENEWABLE ENERGY, L.L.C.,
GENESEE POWER STATION LIMITED
PARTNERSHIP, GRAYLING GENERATING
STATION LIMITED PARTNERSHIP,
HILLMAN POWER COMPANY, L.L.C. TES
FILER CITY STATION LIMITED
PARTNERSHIP, VIKING ENERGY OF
LINCOLN, INC., and VIKING ENERGY OF
MCBAIN, INC.,

UNPUBLISHED
October 22, 2015

       Appellants,

v

No. 321877
MPSC

MICHIGAN PUBLIC SERVICE COMMISSION,

LC No. 00-16890

       Appellee,

and

CONSUMERS ENERGY COMPANY,

       Petitioner-Appellee.

Before: M. J. KELLY, P.J., and MURRAY and SHAPIRO, JJ.

PER CURIAM.

Appellants claim an appeal from an order of the Michigan Public Service Commission (PSC) entered in Consumers Energy Company's 2012 power supply cost recovery (PSCR) case. We affirm in part, reverse in part, and remand.

-1-

## I. FACTS

Consumers Energy filed an application with the PSC seeking approval of its PSCR costs and revenues for the calendar year 2012.[1] Consumers requested a cumulative recovery of $18,472,796, including interest. The Administrative Law Judge (ALJ) granted intervenor status to various parties, including the Attorney General and appellants (collectively referred to as the biomass merchant plants [BMPs]).

Appellants are BMPs who contracted with Consumers. Biomass plants generate electricity in whole or in part from wood waste. 2008 PA 286, which became effective on October 6, 2008, enacted provisions to allow biomass plants to recover fuel and operation and maintenance (O&M) costs that are not covered by existing contracts with electric utilities. The relevant subsections, MCL 460.6a(7)-(9), provide:

> (7) If, on or before January 1, 2008, a merchant plant entered into a contract with an initial term of 20 years or more to sell electricity to an electric utility whose rates are regulated by the commission with 1,000,000 or more retail customers in this state and if, prior to January 1, 2008, the merchant plant generated electricity under that contract, in whole or in part, from wood or solid wood wastes, then the merchant plant shall, upon petition by the merchant plant, and subject to the limitation set forth in subsection (8), recover the amount, if any, by which the merchant plant's reasonably and prudently incurred actual fuel and variable operation and maintenance costs exceed the amount that the merchant plant is paid under the contract for those costs. This subsection does not apply to landfill gas plants, hydro plants, municipal solid waste plants, or to merchant plants engaged in litigation against an electric utility seeking higher payments for power delivered pursuant to contract.

> (8) The total aggregate additional amounts recoverable by merchant plants pursuant to subsection (7) in excess of the amounts paid under the contracts shall not exceed $1,000,000.00 per month for each affected electric utility. The $1,000,000.00 per month limit specified in this subsection shall be reviewed by the commission upon petition of the merchant plant filed no more than once per year and may be adjusted if the commission finds that the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs exceed the amount that those merchant plants are paid under the contract by more than $1,000,000.00 per month. The annual amount of the

---

[1] An electric utility can recover its power supply costs through either base rates, which are established in a general rate case, MCL 460.6a(2)(b), or a PSCR clause. A PSCR clause is "a clause in the electric rates or rate schedule of a utility which permits the monthly adjustment of rates for power supply to allow the utility to recover the booked costs, including transportation costs, reclamation costs, and disposal and reprocessing costs, of fuel burned by the utility for electric generation and the booked costs of purchased and net interchanged power transactions by the utility incurred under reasonable and prudent policies and practices." MCL 460.6j(1)(a).

adjustments shall not exceed a rate equal to the United States consumer price index. An adjustment shall not be made by the commission unless each affected merchant plant files a petition with the commission. As used in this subsection, "United States consumer price index" means the United States consumer price index for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics. If the total aggregate amount by which the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs determined by the commission exceed the amount that the merchant plants are paid under the contract by more than $1,000,000.00 per month, the commission shall allocate the additional $1,000,000.00 per month payment among the eligible merchant plants based upon the relationship of excess costs among the eligible merchant plants. The $1,000,000.00 limit specified in this subsection, as adjusted, shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection. The $1,000,000.00 per month payment limit under this subsection shall not apply to merchant plants eligible under subsection (7) whose electricity is purchased by a utility that is using wood or wood waste or fuels derived from those materials for fuel in their power plants.

(9) The commission shall issue orders to permit the recovery authorized under subsections (7) and (8) upon petition of the merchant plant. The merchant plant shall not be required to alter or amend the existing contract with the electric utility in order to obtain the recovery under subsections (7) and (8). The commission shall permit or require the electric utility whose rates are regulated by the commission to recover from its ratepayers all fuel and variable operation and maintenance costs that the electric utility is required to pay to the merchant plant as reasonably and prudently incurred costs.

The BMPs may recover "reasonably and prudently incurred actual fuel and variable operation and maintenance costs [that] exceed the amount that the merchant plant is paid under the contract for those costs." MCL 460.6a(7). This recovery is subject to a cap of $1,000,000 per month. MCL 460.6a(8). The cap may be adjusted on an annual basis, but the adjustment cannot "exceed a rate equal to the United States consumer price index . . . for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics." MCL 460.6a(8).

The BMPs sought recovery of $7,015,307 in costs not covered by their contracts with Consumers, and contended that the adjustment provided for in MCL 460.6a(8) should be 7.0184%, which represented the cumulative increase in the Consumer Price Index (CPI) between 2009 and 2012. The BMPs asserted that the adjustment should cover this entire period and not just the PSCR year of 2012.

In addition, TES Filer City Station, Limited Partnership (TES Filer), a BMP, sought recovery of $38,303 in nitrogen oxide (NOx) allowance costs and $2,453 in sulfer dioxide (SO2)

allowance costs incurred in 2012. TES Filer asserted that the costs were incurred due to changes in federal and state environmental laws implemented after October 6, 2008.

The ALJ rejected the arguments made by the BMPs and TES Filer. The ALJ noted that the PSC in a prior case found that MCL 460.6a(8) allowed for a CPI adjustment for only the year under consideration. The ALJ also rejected TES Filer's argument that TES Filer incurred costs as a result of changes in environmental regulations that were implemented after October 6, 2008, noting that the PSC had also rejected this argument in a prior case.

The PSC adopted the ALJ's findings and conclusions, stating that the "findings and conclusions comport with Commission precedent."

## II. STANDARD OF REVIEW

A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999).

## III. ANALYSIS

On appeal, the BMPs argue that they are entitled to recover "reasonably and prudently incurred actual fuel and variable operation and maintenance [O&M] costs [that] exceed the amount that the merchant plant is paid under the contract for those costs." MCL 460.6a(7). The BMPs assert that the PSC erred by holding that the adjustment to the $1,000,000 monthly cap in MCL 460.6a(8) should reflect only the 12 months' of inflation for 2012, and that the adjustment should be calculated at a rate equal to the percentage increase of the annual average CPI between 2009, the first full year after MCL 460.6a(8) became effective, and 2012. We disagree.

In *In re Application of Consumers Energy*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket Nos. 314361, 316868), this Court considered and rejected these issues in Docket No. 316868, an appeal brought by the same BMPs that brought the instant appeal. This Court stated:

> In Docket No. 316868, the BMPs challenge the method by which the PSC calculated the annual adjustment to the $1,000,000 monthly capped limit on the fuel and variable operation and maintenance costs payment that the utilities must make to BMPs. Again, § 460.6a(8) provides that the $1,000,000 per month capped limit "may be adjusted" if each affected BMP petitions but "[t]he annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index ["CPI"]." The BMPs posited that this should be interpreted to mean that the Commission should adjust the $1,000,000 monthly limit at a rate equal to the percentage increase in the annual average CPI between 2009, the year after § 460.6a(8) became effective, and 2011, the PSCR year at issue. Alternatively, the BMPs proposed that the adjusted monthly limit from the prior year be multiplied by the annual CPI. However, the PSC interpreted this provision to mean that the adjustment should be calculated each year by multiplying $1,000,000 by the annual CPI, rather than by a cumulative CPI.

-4-

We conclude that the statute is equally susceptible to more than one meaning with regard to this question and is therefore ambiguous. See *In Re Application of Indiana Michigan Power Co to Increase Rates,* 297 Mich App at 344. The BMPs argue that use of the plural, "adjustments," indicates that cumulative annual "adjustments" were intended. However, use of the term "adjustments" is not determinative. It could refer to the annual adjustments made each year without contemplating that they be cumulative. Moreover, if the Legislature had instead said "the annual amount of the adjustment[] shall not exceed a rate equal to the United States consumer price index," it would not have provided clarity regarding what sum is to be adjusted or regarding whether the term "rate equal to the United States consumer price index" was meant to reflect the yearly rate or a cumulative rate. However, the PSC's reasoning on the meaning of the pluralization is not logical. It posited that

> the statute contemplates multiple petitions: "An adjustment shall not be made by the commission unless each affected merchant plant files a petition with the commission." MCL 460.6a(8). Therefore, the use of the plural "adjustments" is logically related to the fact that the provision is not limited to one merchant plant, but can [sic] applied to any plant that satisfies the substantive requirements.

The statute allows for and requires petitions from all affected BMPs in order for there to be an adjustment, but the adjustment made is to the $1,000.000 cap. There is only one annual adjustment to the cap, not multiple adjustments reflecting the applications of the various BMPs. In sum, the pluralization of "adjustment" is inconclusive when trying to discern the meaning of the statute.

The PSC also reasoned that although the statute did not prohibit a cumulative CPI calculation, it did not expressly provide for such a calculation, and it could not read words into the statute. However, to conclude that the language of the statute means that the "rate equal to the United States consumer price index" means solely the rate corresponding to the year of the PSCR reconciliation would also require that language be added for clarification.

The language of the statute does not provide guidance on whether the CPI to be used for the annual adjustments is the cumulative CPI or the CPI for a given year. Moreover, it does not speak to whether the cap that should be adjusted is the $1,000,000 cap or the $1,000,000 cap as adjusted in prior years. However, by tying the adjustment to the CPI, it seems clear that the Legislature's intent was to account for inflation. If the $1,000,000 cap were adjusted each year based on the CPI rate for that year, the BMPs would receive the inflation-adjusted equivalent of less than $1,000.000 per month beginning in the 2011 calendar year. Thus, upholding the PSC's construction of the statute would lead to a potentially absurd result seemingly at odds with legislative intent. Since the overriding goal of statutory construction is to give effect to the intent of the Legislature, *In Re Application of Indiana Michigan Power Co to Increase Rates,* 297 Mich App at 344-345, and this requires a construction that avoids absurd results when possible,

see *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 674-675; 760 NW2d 565 (2008), we conclude that the PSC erred in construing § 460.6a(8). Further, we conclude that it should be construed to mean that annual adjustments to the $1,000,000 cap shall be calculated by applying the CPI rate for the PSCR year at issue to the $1,000,000 cap as adjusted in prior years, or by applying the cumulative CPI rate from 2009 forward to the $1,000,000 cap. [*In re Application of Consumers Energy Co*, slip op at 10-11 (footnote omitted).]

This decision constitutes binding precedent which we are required to follow. MCR 7.215(J)(1). Therefore, we conclude that the PSC erred by adjusting the cap by applying the CPI rate for 2012 only, the PSCR year at issue, reverse the PSC's decision in part, and remand this case to the PSC for recalculation of the cap.

The BMPs also argue that the PSC erred by ignoring the significance of the word "implemented" in MCL 460.6a(8). The rules promulgated by the MDEQ in 2007 did not impose new regulations at that time, but were intended to do so in 2009. The rules were implemented after MCL 460.6a(8) went into effect; thus, TES Filer was entitled to recover its costs. We disagree.

In *In re Application of Consumers Energy for Reconciliation of Costs*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket Nos. 314361, 316868), this Court considered and rejected these issues in Docket No. 314361, an appeal brought by TES Filer. This Court stated:

> TES Filer challenges the denial of its requests for recovery of costs for NOx and SO2 allowances, explaining that the allowances are limited authorizations to emit these substances. It established that these were "actual fuel and variable operation and maintenance costs." It asserts that they were "incurred due to changes in federal or state environmental laws or regulations" "implemented after" October 6, 2008, maintaining that "implementation" must refer to the date that some action is required by a law or regulation. The PSC interpreted § 460.6a(8) to mean that the term "implemented" refers to the date that a federal or state environmental law or regulation was enacted or promulgated. It further determined that TES Filer was not entitled to recover the costs of the NOx and SO2 allowances incurred in the 2010 and 2011 calendar years because the laws or regulations requiring the allowances predated October 6, 2008. We find no cogent reason to overturn the PSC's interpretation.
>
> \* \* \*
>
> The § 460.6a(8) statutory phrase, "incurred due to changes in federal or state environmental laws or regulations that [were] implemented after" October 6, 2008, could be read to mean that a BMP is entitled to recoup actual fuel and variable operation and maintenance costs if the *requirements* of the changes in the laws or regulations were implemented after the effective date or, alternatively, if the changes to the law or regulations were made (implemented) after the effective date.

-6-

* * *

Again, the statute provides that the cap "shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are implemented after" October 6, 2008. The Attorney General argues that the phrase "that are implemented" refers to the antecedent clause "that are incurred due to changes in federal or state environmental laws or regulations." TES Filer argues that the phrase "that are implemented" refers to "changes in federal or state environmental laws or regulations." However, this does not clarify what "changes" are being referred to. We note that the last antecedent word or phrase before "that are implemented" is "federal or state environmental laws or regulations." If it is these laws or regulations "that are implemented," as opposed to "changes in" these "laws or regulations," then TES Filer would prevail with respect to its argument that implementation occurred when the laws or regulations were required to be carried out. However, this construction would render "changes in" mere surplusage. "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). Since the last antecedent rule does not require a look at the shortest antecedent, and the antecedent that makes sense of all the terms is "changes in federal or state environmental laws or regulations," the phrase "that are implemented" should be viewed as referring to "changes in federal or state environmental laws or regulations."

This leaves open the question of whether the "changes" implemented are those required by the law or regulation, or whether they are the changes to the law or regulation. TES Filer argues that "changes" are "implemented" when they are actually fulfilled, carried out, executed, or effectuated. With respect to NOx allowances, TES Filer made the same argument in *In re Application of Consumers Energy Co for Reconciliation of 2009 Costs,* unpublished opinion per curiam of the Court of Appeals, issued April 29, 2014 (Docket Nos. 305066 and 305083). We adopt the reasoning from that opinion:

> On appeal, TES Filer argues that the PSC erred by ignoring the significance of the word "implemented" in MCL 460.6a(8). TES Filer asserts that the common meaning of the word "implemented" is "to have carried out, fulfilled, or effectuated a plan." TES Filer notes that the rules promulgated by the Michigan Department of Environmental Quality (MDEQ) in 2007 did not impose new regulations at that time, but were intended to do so in 2009; thus, the PSC should have concluded that the 2007 rules, even if in effect during the relevant period, were not implemented during that same period. The rules were implemented after MCL 460.6a(8) went into effect; therefore, TES Filer was entitled to recover its costs. We disagree.

-7-

TES Filer ignores the context surrounding the word "implemented" in the statutory scheme. This Court does not read statutory provisions in isolation, but instead considers them in context. *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). The NOx emission rules that were applicable to TES Filer did not change after October 6, 2008, the date that MCL 460.6a(8) went into effect. At issue in this case is not the meaning of the term "implemented," but rather on what date TES Filer was affected by the NOx emission rules. In context, MCL 460.6a(8) provides that the limit does not apply to specified costs "that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection." MCL 460.6a(8) compares the effective date of the statute and the date of any changes in state or federal environmental rules. It is undisputed that MCL 460.6a(8) went into effect on October 6, 2008. The MDEQ promulgated rules by filing them with the Secretary of State on June 25, 2007. MCL 24.246(1). The MDEQ's rules became effective prior to October 6, 2008.

\* \* \*

The MDEQ's rules were implemented in 2007; however, the fact that TES Filer only became subject to the rules in 2009 did not constitute a substantive change in the rules implemented after October 6, 2008. Regardless of the meaning of the word "implemented," the change occurred well before TES Filer incurred its costs. We conclude that TES Filer was not entitled to recover its NOx emission costs. [Unpub op at 7.]

Since the phrase "that are implemented" modifies "changes in federal or state environmental laws or regulations," it refers to implementation of changes in the law or regulation, and not implementation of changes required by these laws or regulations. We note that the context of the statute indicates that the intent was to allow BMPs to recover for the costs of compliance with new requirements. However, if the requirements were in place before October 6, 2008, even if compliance was not yet required, the requirements were not new.

With respect to the NOx requirements, TES Filer argues that the relevant changes in laws or regulations did not occur before October 6, 2008. TES Filer acknowledges that, if enforceable, Mich Admin Code, R 336.1821 to R 336.1834 would have required the purchase of NOx allowances in 2009. However, TES Filer points by way of example to R 336.1822(2), noting that it speaks of "CAIR NOx allowances for the 2009 ozone season control period." It notes that under R 336.1803(3), "CAIR NOx allowance" must be defined by reference to 40 CFR 97.102, which provides:

-8-

CAIR NOx allowance means a limited authorization issued by a permitting authority or the Administrator under subpart EE of this part or §97.188, or under provisions of a State implementation plan that are approved under §51.123(o)(1) or (2) or (p) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar year thereafter under the CAIR NOx Program. An authorization to emit nitrogen oxides that is not issued under subpart EE of this part, §97.188, or provisions of a State implementation plan that are approved under §51.123(o)(1) or (2) or (p) of this chapter shall not be a CAIR NOx allowance.

Similarly, 40 CFR 97.302 defines "CAIR NOx Ozone Season allowance" as

a limited authorization issued by a permitting authority or the Administrator under subpart EEEE of this part, §97.388, or provisions of a State implementation plan that are approved under §51.123(aa)(1) or (2) (and (bb)(1)), (bb)(2), (dd), or (ee) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar year thereafter under the CAIR NOx Ozone Season Trading Program or a limited authorization issued by a permitting authority for a control period during 2003 through 2008 under the NOx Budget Trading Program in accordance with §51.121(p) of this chapter to emit one ton of nitrogen oxides during a control period, provided that the provision in §51.121(b)(2)(ii)(E) of this chapter shall not be used in applying this definition and the limited authorization shall not have been used to meet the allowance-holding requirement under the NOx Budget Trading Program. An authorization to emit nitrogen oxides that is not issued under subpart EEEE of this part, §97.388, or provisions of a State implementation plan that are approved under §51.123(aa)(1) or (2) (and (bb)(1)), (bb)(2), (dd), or (ee) of this chapter or under the NOx Budget Trading Program as described in the prior sentence shall not be a CAIR NOx Ozone Season allowance.

Since both of these CFRs refer to state SIPs that have been approved, TES Filer concludes that references in Michigan's 2007 rules to CAIR NOx allowances and CAIR NOx Ozone Season allowances can only refer to allowances authorized by a state plan that has been approved by the EPA. Since Michigan's rules were not approved until 2009, TES Filer asserts that the 2007 rules were nonfunctional. Accordingly, it argues, TES Filer could not have incurred its 2009 NOx allowance costs due to changes in regulations implemented before October 6, 2008 because the 2007 regulations did not regulate NOx allowances.

This is a compelling argument, especially since the EPA expressly disapproved Michigan's 2007 rules when it approved Michigan's 2009 rules. However, as a matter of state regulations, the 2007 rules required CAIR NOx allowances for 2009. As stated above, the state regulations became effective on June 25, 2007 immediately upon filing with the Secretary of State. While CAIR NOx allowances and CAIR NOx Ozone Season allowances refer to allowances issued under a federally-approved SIP, this would mean that the 2007 rules required these allowances at the point that the EPA approved the state SIP. The requirement existed in 2007 but did not mature into an obligation until there was EPA approval. Since the allowances were required by the 2007 state regulations, the costs of the allowances were incurred due to 2007 changes in state environmental regulations, and the changes in the regulations were implemented in 2007, before the October 6, 2008 effective date of subsection (8). Accordingly, TES Filer was not entitled to recoup these costs.

Just as regulations requiring NOx allowances were implemented before October 6, 2008, regulations requiring SO2 allowances were implemented before October 6, 2008. Although it did not require that the SO2 allowances be immediately purchased, it is undisputed that in 2005 the CAIR required the SO2 allowances. Since this change in the law was implemented before October 6, 2008, regardless of the fact that TES Filer did not become subject to the law until 2010, TES Filer is not entitled to uncapped recovery of its SO2 allowances costs. [*In re Application of Consumers Energy*, slip op at 4, 6-9 (internal citations omitted).][2]

This decision constitutes binding precedent which we are required to follow. MCR 7.215(J)(1). Therefore, we conclude that the PSC correctly held that TES Filer was not entitled to recover for NOx and SO2 allowances.

---

[2] *In re Application of Consumers Energy* inadvertently cites and quotes from the unpublished opinion *In re Application of Consumers Energy Co for Reconciliation of 2009 Costs*, unpublished opinion per curiam of the Court of Appeals, issued April 29, 2014 (Docket Nos. 305066 and 305083). That decision has now been published. *In re Application of Consumers Energy Co for Reconciliation of 2009 Costs (On Reconsideration)*, 307 Mich App 32; 859 NW2d 216 (2015). TES Filer filed an application for leave to appeal to our Supreme Court, challenging this Court's decision on the issues raised in Docket No. 305066. Our Supreme Court has scheduled oral argument on whether to grant leave or take other action on the application. *In re Application of Consumers Energy Co for Reconciliation of 2009 Costs*, 497 Mich 1036; 864 NW2d 138 (2015).

## IV. CONCLUSION

Our decision in this case is governed by this Court's decision in *In re Application of Consumers Energy Co*. We affirm in part, reverse in part, and remand this case to the PSC for further proceedings in accordance with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Douglas B. Shapiro